# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | |
|---|---|
| Julissa Ovalle, Lynne Cassani, Angel Buitrago, Michael Mize, and Cynthia Medina, as representatives of a class of similarly situated persons, and on behalf of Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning and Refrigeration, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> Howard Barton, Diane Dello Russo, Donald Fortin, Charles Brinkley, James Urbach, and Astara Capital Partners Fund I, L.P., <br><br> Defendants. | Case No. <br><br> **COMPLAINT** <br><br> **CLASS ACTION** <br><br> **DECLARATORY RELIEF REQUESTED** |

1

## NATURE OF THE ACTION

1.      Plaintiffs Julissa Ovalle, Cynthia Cassani, Angel Buitrago, Michael Mize, and Cynthia Medina ("Plaintiffs"), as representatives of the Class described herein, and on behalf of the Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning and Refrigeration, Inc. (the "ESOP"), bring this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants Howard Barton, Diane Dello Russo, Donald Fortin, Charles Brinkley, James Urbach, and Astara Capital Partners Fund I, L.P. (collectively "Defendants").

2.      As described herein, Defendants forced the ESOP to sell control of Del-Air for less than fair market value in the wake of the company founder's death. Instead of acting in the interest of Del-Air employees, Defendants looked out for their own interests, looked the other way, or knowingly profited from the unfair deal.

3.      As a result, Plaintiffs and other ESOP participants lost more than half their retirement benefits. Plaintiffs bring this action on behalf of the ESOP, and on behalf of ESOP participants as a class, to recover lost benefits, remedy Defendants' unlawful conduct, and prevent future harm to the ESOP.

## INTRODUCTION

4.     Del-Air was founded as Del-Air Heating, Air Conditioning and Refrigeration, Inc. in 1983 by Robert "Bob" Dello Russo. Del-Air provides heating, air conditioning, refrigeration, plumbing, and electrical services to homeowners and builders.

5.     In two transactions, the first in 2005 and the second in 2015, Bob Dello Russo sold the company to Del-Air employees through the ESOP. After the two transactions were completed, the ESOP owned 100% of Del-Air's stock for a total purchase price of $44.7 million.

6.     At the end of 2020, the company had over 1,000 employee-owners and the ESOP's stock was valued at $45.8 million.

7.     In 2021, Bob Dello Russo died. After his death, the company's board of directors consisted of his wife, Defendant Diane Dello Russo; his brother-in-law, Defendant Donald "Richard" Fortin; his business partner, Defendant Howard "Chad" Barton; and his banker, Defendant Charles Brinkley.

8.     Rather than guide the company for the benefit of Del-Air's employee-owners as ERISA demands, the directors pursued their own interests, or allowed their co-directors to do so, at the ESOP's expense.

9.     Diane Dello Russo was a creditor to the ESOP and the company and wanted her loans to be accelerated and paid in full. And Chad Barton had

recently exited another business venture with Bob Dello Russo and private equity investors and was looking for a new investment. Barton orchestrated a recapitalization of Del-Air that transferred a 76% ownership stake to himself and co-investors (through Defendant Astara Capital Partners Fund I, L.P., hereinafter the "Astara Fund") at a steep discount and paid Diane Dello Russo's loans immediately and in full. Richard Fortin and Charles Brinkley stood by and allowed this self-serving transaction to proceed (to the extent they did not participate in it personally). The ESOP's independent trustee, Defendant James Urbach, sanctioned this heist and failed to protect the ESOP.

10.     The recapitalization stripped the ESOP of its stock at a fire sale price of $18.5 million, far less than its fair market value of between $40 and $50 million or more. The board did not shop the company in the marketplace or investigate alternatives to a sale for the benefit of ESOP participants. Discovery will show that Barton was determined to capture the company at a discounted price for himself and his co-investors and manipulated the company's financials—as well as the board and trustee's review of the company's options—to achieve that result.

11.     In reality, the ESOP received even less than $18.5 million for its shares. Nearly $2 million of that sum was used to satisfy the company's pre-transaction debt to participants who initiated distributions that the company was liable to fund. By subtracting this sum from the consideration received by

the ESOP for its shares, Defendants unfairly lopped off even more from the fire sale price the ESOP received.

12.    Defendants also counted the ESOP's 24% stake in recapitalized Del-Air toward the $18.5 million price. However, Defendants valued the ESOP's 24% stake without applying appropriate discounts for the ESOP's lack of near-term profits participation and loss of control. The 24% minority stake issued to the ESOP was designated "Class C" and is ineligible for profits distributions until the Astara Fund recoups its entire investment. Given these limitations, the ESOP was owed either more stock or more cash to make up for the value transferred to the Astara Fund.

13.    In addition to damages caused to date, Plaintiffs and other ESOP participants face substantial risk of future harm. The recapitalization deal set a clock for the ESOP's remaining stake in Del-Air to be liquidated starting no later than 2028. Under the deal, the Astara Fund may buy out the ESOP's stake at any time. So long as Defendants occupy fiduciary positions with respect to the ESOP and the Astara Fund is permitted to acquire the ESOP's stake, Plaintiffs and other participants risk being shortchanged their ESOP benefits yet again.

14.    Barton, Diane Dello Russo, Fortin, Brinkley, and Urbach all had fiduciary duties pursuant to ERISA to act in the interest of ESOP participants and with due care. They failed to satisfy their duties and are liable to the ESOP

for its losses and any undue profits they received. They also should be removed from any fiduciary positions with respect to the ESOP given the potential for further harm related to the liquidation of ESOP's remaining shares.

15.    The Astara Fund knowingly profited from its co-Defendants' fiduciary violations and should not be permitted to retain its windfall or acquire additional shares from the ESOP.

16.    Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1104, 1106 & 1132(a)(2)-(3) to remedy Defendants' unlawful conduct, recover losses to the ESOP, prevent further harm to the ESOP, and obtain other appropriate relief.

## JURISDICTION AND VENUE

17.    Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

18.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

19.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the ESOP was administered in this district and several of the fiduciary breaches occurred in this district.

## PARTIES

*Plaintiffs*

20.    Plaintiff Julissa Ovalle is a natural person residing in Apopka, Florida. She worked for Del-Air between 2000 and 2022 and has a current account in the ESOP. She lost more than half the value of her ESOP benefits through the recapitalization transaction. She faces ongoing risk that her ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

21.    Plaintiff Lynne Cassani is a natural person residing in Sanford, Florida. She worked for Del-Air between 2012 and 2022 and has a current account in the ESOP. She lost more than half the value of her ESOP benefits through the recapitalization transaction. She faces ongoing risk that her ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

22.    Plaintiff Angel Buitrago is a natural person residing in Orlando, Florida. He worked for Del-Air between 2015 and 2022 and has a current account in the ESOP. He lost more than half the value of his ESOP benefits through the recapitalization transaction. He faces ongoing risk that his ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

23.     Plaintiff Michael Mize is a natural person residing in Statesboro, Georgia. He worked for Del-Air between 2017 and 2021 and has a current account in the ESOP. He lost more than half the value of his ESOP benefits through the recapitalization transaction. He faces ongoing risk that his ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

24.     Plaintiff Cynthia Medina is a natural person residing in Deltona, Florida. She worked for Del-Air between 2019 and 2023 and has a current account in the ESOP. She lost more than half the value of her ESOP benefits through the recapitalization transaction. She faces ongoing risk that her ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

## *The ESOP*

25.     Plaintiffs sue derivatively on behalf of the ESOP pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).[1]

26.     The ESOP was established effective January 1, 2005 by Del-Air. It is administered at Del-Air's headquarters in Sanford, Florida.

27.     The ESOP is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); an "individual account plan" as defined by

---

[1] To the extent that any relief sought in this action is not available under 29 U.S.C. § 1109(a) and 1132(a)(2), Plaintiffs alternatively and additionally seek relief pursuant to 29 U.S.C. § 1132(a)(3).

29 U.S.C. § 1002(34) (also known as "defined contribution plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6).

28.     The ESOP's participants are Del-Air employees who met minimum age and service requirements prior to the recapitalization of Del-Air on or around October 28, 2022. Del-Air is thus the ESOP "employer" within the meaning of 29 U.S.C. § 1002(5). The purpose of the ESOP is to allow Del-Air employees to be beneficial owners of Del-Air stock and receive retirement benefits pro rata based on the value of Del-Air stock.

29.     Upon recapitalization of Del-Air on or around October 28, 2022, all ESOP participants were deemed to have terminated employment with Del-Air (even if they continued to work for recapitalized Del-Air), and the ESOP was closed to new participants. As a result, all ESOP participant accounts are due to be distributed starting no later than 2028.

*Defendants*

30.     Defendant Howard "Chad" Barton is a natural person residing in New Smyrna Beach, Florida. He was a member of Del-Air's board of directors between June 2021 and October 1, 2022. As a member of the board, Barton was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H). Likewise, he was a fiduciary of the ESOP due to fiduciary responsibilities delegated to the board by the company and functional control he exercised with respect to the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra*

¶¶ 54–74, 94–102). *See* 29 U.S.C §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1). Moreover, as an investor in the Astara Fund, Barton received an indirect interest in Del-Air through the recapitalization of Del-Air. Alternatively, he had an interest in the Astara Fund deal through incentive compensation paid by the Astara Fund or its affiliates in connection with the deal.

31.    Defendant Diane Dello Russo is a natural person residing in Longwood, Florida. She was a member of Del-Air's board of directors at the time of the recapitalization of Del-Air on or around October 28, 2022. As a member of the board, Diane Dello Russo was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H). Likewise, she was a fiduciary of the ESOP due to fiduciary responsibilities delegated to the board by the company and control she exercised with respect to the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra* ¶¶ 54–74, 94–102). *See* 29 U.S.C §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1). As a creditor of Del-Air and the ESOP, she received $9 million in the recapitalization of Del-Air.

32.    Defendant Donald "Richard" Fortin is a natural person residing in Heathrow, Florida. He was the chairman of Del-Air's board of directors at the time of the recapitalization of Del-Air on or around October 28, 2022. As a member of the board, Fortin was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H). Likewise, he was a fiduciary of the ESOP due to

fiduciary responsibilities delegated to the board by the company and control he exercised with respect to the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra* ¶¶ 54–74, 94–102). *See* 29 U.S.C §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1).

33.    Defendant Charles Brinkley is a natural person residing in Lake Mary, Florida. He was a member of Del-Air's board of directors at the time of the recapitalization of Del-Air on or around October 28, 2022. As a member of the board, Brinkley was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H). Likewise, he was a fiduciary of the ESOP due to fiduciary responsibilities delegated to the board by the company and control he exercised with respect to the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra* ¶¶ 54–74, 94–102). *See* 29 U.S.C §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1).

34.    Defendant James Urbach is a natural person residing in Atlantic Beach, Florida. He has been the ESOP's independent trustee since around 2012. He acted as a fiduciary of the ESOP under the terms of the ESOP and by exercising control with respect to the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra* ¶¶ 54–74, 94–102). *See* 29 U.S.C §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1).

35.    Defendant Astara Capital Partners Fund I, L.P. is a limited partnership organized under the laws of the state of Delaware in April 2022.

Presently, following the recapitalization of Del-Air, the Astara Fund is the indirect majority owner of Del-Air.

## ERISA OVERVIEW

### *29 U.S.C. § 1106(a)*

36.   ERISA prohibits transactions between a plan and a party in interest, and transactions designed to benefit a party in interest. *See* 29 U.S.C. § 1106(a)(1)(A) & (D).

37.   ERISA's prohibition on party in interest transactions is excused only if the fiduciaries and other participants to the transaction can prove that the plan received "adequate consideration" in the deal. *See* 29 U.S.C. § 1108(e)(1); *Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 935 (N.D. Ill. 1998) ("[D]efendants bear the burden of proving that the transaction [redeeming ESOP shares] was fair and of benefit to the ESOP shareholders.").

38.   "Adequate consideration" is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." 29 U.S.C. § 1002(18); *see also Montgomery*, 39 F. Supp. 2d at 919 ("It must be shown that they arrived at their determination of adequate consideration in good faith by way of a prudent investigation and the application of sound business principles of evaluation.").

39.    "Fair market value" is customarily considered to be "the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for such asset." *See* Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17637 (May 17, 1988).[2]

40.    The sale of ESOP assets is a prohibited transaction if it is designed to benefit a party in interest, as such a transaction constitutes the "use" of plan assets for the benefit of a party in interest, and the "indirect … transfer" of plan assets to the party in interest. *See Carter v. San Pasqual Fiduciary Trust Co.*, 2016 WL 6803768, at *6 (C.D. Cal. Apr. 18, 2016) (company directors "caused … [the company] to redeem [the company's] stock held by the Plan" in order to sell that stock to a third party and thereby "indirectly transferred Plan assets to [themselves]" because the directors received consideration from the third-party buyer); *Montgomery*, 39 F. Supp. 2d at 939 (company director that

---

[2] Courts and practitioners customarily use this definition for guidance, although the regulation was never enacted. *See Brundle v. Wilmington Tr.*, 919 F.3d 763, 770 (4th Cir. 2019), as amended (Mar. 22, 2019) ("Department of Labor (DOL) has proposed, but never enacted, regulations" defining "adequate consideration." Nonetheless, "courts look to these regulations for guidance"); *Montgomery*, 39 F. Supp. 2d at 936–37 (citing unenacted regulation).

benefited indirectly from ESOP redemption was "clearly liable for having failed to sell the [ESOP's] stock [back to the company] for adequate consideration.").

*29 U.S.C. § 1106(b)*

41.    ERISA also demands that fiduciaries "shall not" act for their own account or otherwise act adversely to a plan. *See* 29 U.S.C. § 1106(b).

42.    Specifically, a fiduciary "shall not" "deal with the assets of the plan" for their own interest or account (§ 1106(b)(1)); "act . . . on behalf of a party whose interests are adverse to the interests of the plan" in a "transaction involving the plan" (§ 1106(b)(2)); or "receive any consideration for [their] own personal account from any party" in connection with a "transaction involving the assets of the plan" (§ 1106(b)(3)).

43.    Just as with 1106(a), transactions prohibited by section 1106(b) are excused only if the fiduciary and other participants to the transaction can show that the plan received adequate consideration for the ESOP shares. 29 U.S.C. § 1108(e)(1).

44.    Section 1106(b) "should be read broadly in light of Congress' concern with the welfare of plan beneficiaries." *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984).

45.    Transfer of ESOP assets to benefit a board member is a fiduciary self-dealing transaction in violation of section 1106(b). *See Montgomery,* 39 F. Supp. 2d at 915, 935 ("The transaction in which [company] redeemed more

than 95% of the outstanding shares involved self-dealing" where the "motive behind the transaction was the transfer of ownership to [company president and board member].")

*29 U.S.C. § 1104(a)(1)*

46.    A fiduciary is also liable for failing to act prudently and loyally with respect to any matter involving the fiduciary's duties to the plan. 29 U.S.C. § 1104(a)(1); *see also Brundle v. Wilmington Tr.,* 919 F.3d at 763, 773 (4th Cir. 2019) ("[A]n ESOP fiduciary is liable to the plan participants if it breached its fiduciary duties, i.e., failed to act 'solely in the interest of the participants,' with the care, skill, prudence, and diligence used by a 'prudent man acting in a like capacity.'").

47.    An independent trustee is liable if its "decision-making process [is] inadequate." *Id.* at 774. In order to satisfy its duty, a trustee must consider the motivations of the parties and "investigat[e] whether [such motivations] affected the ESOP's legality under ERISA." *Id.* at 778. A trustee must be "critical" of information supplied by company management if management has "financial incentives" in the deal. *Id.* at 775.

48.    If the acquisition of a plan's stock will benefit company insiders, the "corporate insiders with fiduciary duties to the [plan] are obliged at a minimum to engage in an intensive and scrupulous independent investigation

of their options to insure that they act in the best interests of the plan beneficiaries." *Leigh*, 727 F.2d at 124–26.

49.   ERISA's fiduciary standard also applies to actions that "influenc[e] the outcome of [an independent advisor's] valuations" of company stock. *Perez v. Bruister*, 823 F.3d 250, 259–60 (5th Cir. 2016); *see also Howard v. Shay*, 100 F.3d 1484, 1490 (9th Cir. 1996) ("limiting the information conveyed to the expert" in order to "sway the final valuation that will set the transaction price" was a fiduciary act).

### 29 U.S.C. § 1105(a)

50.   Fiduciaries may also be liable for their actions with respect to other fiduciaries. *See* 29 U.S.C. § 1105(a). Section 1105 requires a fiduciary to attempt to "prevent or remedy the breach" of another fiduciary. *In re Amsted Indus., Inc. Litig.*, 263 F. Supp. 2d 1126, 1130 (N.D. Ill. 2003). Company insider fiduciaries may be liable for "enabling a fiduciary breach by [the ESOP trustee]" by failing to provide true valuation information to the trustee. *See Placht v. Argent Tr. Co.*, 2022 WL 3226809, at *9 (N.D. Ill. Aug. 10, 2022).

### 29 U.S.C. § 1132(a)(3)

51.   Although ERISA sections 1104–1106 do not "explicitly impos[e] a duty upon an 'other person' not to" participate in a fiduciary's violations, the Supreme Court has held that one of ERISA's remedies provisions, section 1132(a)(3), "itself imposes certain duties" upon non-fiduciaries. *See Harris Tr.*

16

& *Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245, 248 (2000). This is because section 1132(a) calls for "appropriate equitable relief"—relief that traditionally included "restitution" from non-fiduciaries who benefited from fiduciary misconduct with "notice of the fiduciary's breach of duty." *Id.* at 250; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011) ("A person who obtains a benefit in breach of a fiduciary duty ... [or] in consequence of another's breach of such a duty, is liable in restitution to the person to whom the duty is owed.").

52.    Courts commonly use the phrase "knowing participation" as shorthand to describe prohibited engagement by a non-fiduciary in an ERISA violation. *See Walsh v. Vinoskey*, 19 F.4th 672, 677–78 (4th Cir. 2021). In the context of a transaction prohibited by section 1106, "to knowingly participate" is to "have knowledge" that the plan's counterparty received consideration "in excess of fair market value." *Id.*; *see also Dolins v. Cont'l Cas. Co.*, 2017 WL 3581143, at *7 (N.D. Ill. Aug. 18, 2017) (allegation that non-fiduciary "had reason to know that the [transaction] would benefit it and, by extension, [a party in interest], to the Plan beneficiaries' detriment" was "plainly enough" to state a knowing participation claim); *Fish v. GreatBanc Tr. Co.*, 109 F. Supp. 3d 1037, 1043 (N.D. Ill. 2015) (participants may seek relief from "a knowing, gratuitous transferee" of an ESOP transaction).

17

53.     A claim for knowing participation in breach of section 1104 duties may also be made based on a showing that non-fiduciaries had reason to know that the price was unfair to the plan, and thus that the fiduciaries did not engage in a satisfactory review process. *See Placht*, 2022 WL 3226809, at *9 ("The [non-fiduciary defendants] have provided no logical or textual basis for distinguishing a claimed violation of 29 U.S.C. § 1104 from one under 29 U.S.C. § 1106 [for purposes of a knowing participation claim.]"); *Gamino v. KPC Healthcare Holdings, Inc.*, 2021 WL 5104382, at *6 (C.D. Cal. Nov. 1, 2021) (reasonable to infer that non-fiduciaries, "given their roles and their knowledge of the value of the securities[,] knowingly participated in [fiduciary's] ERISA § 404 breach.").

## ESOP GOVERNANCE AND THE TRANSACTION

*Board and Trustee Fiduciary Powers*

54.     Bob Dello Russo led Del-Air's board until to his death in June 2021. After he died, Diane Dello Russo invited his longtime business partner, Barton, to join her on the board.

55.     Barton and Bob Dello Russo partnered on multiple business ventures going back to 2004 or earlier. However, Barton did not own any part of Del-Air until the recapitalization transaction at issue in this action.

56.     The company's board also included Fortin, Diane Dello Russo's brother-in-law, and Brinkley, a banking executive who worked with the Dello Russos over the years.

57.     The ESOP was governed by written terms called the Plan Document.

58.     Under Sections 2.40 and 14.1 the Plan Document, the company is a named fiduciary of the ESOP responsible for (a) appointing the trustee and monitoring the trustee's performance, (b) communicating a funding policy to the trustee, (c) providing information to the trustee necessary for the trustee to properly perform his or her duties, and (d) providing a channel for the trustee to communicate directly with participants.

59.     In Section 17.2 of the Plan Document, the company delegated its fiduciary responsibilities to the members of its board. In connection with the recapitalization of Del-Air, the board members performed these duties by continuing to employ Urbach as ESOP trustee, providing him information for his independent review of the transaction, and setting parameters for him to communicate the deal to ESOP participants.

60.     Under Sections 2.28 and 7.5 of the Plan Document, the board may appoint an ESOP Committee empowered to direct the ESOP trustee how to vote shares owned by the ESOP in any matter requiring a shareholder vote. However, for purposes of the recapitalization transaction, the board exercised

the functional powers of the ESOP Committee and recommended that the ESOP trustee vote in favor of the transaction on behalf of the ESOP as the company's sole shareholder.[3]

61.     The ESOP trustee—professional ESOP advisor James Urbach—is a named fiduciary of the ESOP under Section 2.40 of the Plan Document. Section 7.5 provides that the ESOP trustee has discretion to decline to follow any instruction that is inconsistent with ERISA. Thus, the trustee is required to independently review any recommended action to determine if it is in the best interest of ESOP participants.

*The Recapitalization Transaction*

62.     The Astara Fund is managed by an affiliated firm, Astara Capital, organized in 2020 to make equity investments in mid-sized companies.

63.     Astara Capital's managing partner previously invested with Bob Dello Russo and Barton in a company Barton founded in 2005 called American Builders Supply. The group exited the American Builders Supply investment in 2017, and Barton joined Astara Capital Partners in 2020.

---

[3] Based on information available to Plaintiffs at this stage, it is not clear whether an ESOP Committee separate from the company board was active at the time of the recapitalization. Regardless, it was the board that evaluated the potential deal, approved it, and recommended it to Urbach, not a separate ESOP Committee.

64.     In addition to investing in the Astara Fund, Barton performed operations duties for Astara Capital, including finding companies for the firm's partners and clients to acquire.

65.     Once seated on the Del-Air board, Barton played both sides to strike a deal for the Astara Fund to acquire control of Del-Air. Beginning in spring 2022 or earlier, he acted as an agent of both the seller (the ESOP) and the potential buyer (the Astara Fund and its affiliates). After the deal was completed, Barton—speaking on behalf of Astara Capital—told the Orlando Business Journal, "We looked at this deal hard and Del-Air obviously has a great name in town."[4]

66.     The Del-Air board did not shop the company in the marketplace and dealt only with Barton and Astara Capital as potential buyers. The Astara Fund and Astara Capital were apprised of all relevant details about the transaction by virtue of Barton's involvement.

67.     After the deal was substantially complete, Barton resigned from Del-Air's board on October 1, 2022. The remaining board members

---

[4] Steven Ryzewski, New York's Astara Capital acquires Orlando-based Del-Air, ORLANDO BUSINESS JOURNAL, Nov. 4, 2022, *available at* https://www.bizjournals.com/orlando/news/2022/11/04/del-air-heating-air-conditioning-sold-astara-cap.html. Barton spoke on behalf of Astara Capital in a press release issued by Del-Air concerning the recapitalization. *See* Rob Haines, Del Air Receives Investment from Leading Private Equity Firm, PR NEWSWIRE (Nov. 9, 2022), *available at* https://www.prnewswire.com/news-releases/del-air-receives-investment-from-leading-private-equity-firm-301672587.html (Barton stating that "The Astara team is thrilled to add Del-Air to our portfolio.").

unanimously approved the deal on October 10, 2022, and recommended that Urbach vote the ESOP's shares in favor of the deal in his capacity as ESOP trustee.

68.     Discovery will show that, prior to Barton's resignation, the board alerted Urbach to the proposed deal and provided Urbach information about the company and deal intended for Urbach to perform his duty to independently review the transaction. After the board officially approved and recommended the deal, Urbach decided to vote in favor of the transaction.

69.     The board and Urbach jointly prepared a notice of the deal to ESOP participants and distributed it to them around October 18, 2022. The notice was styled as coming from Urbach, but the board exercised its authority to limit and approve its contents.

70.     The notice highlighted in bold text that both the board and Urbach had determined that it was in the "best interest" of the ESOP to proceed with the recapitalization. The notice declared that Urbach would vote the ESOP's shares that had not yet been allocated to individual participants in favor of accepting the deal.

71.     The notice superficially invited ESOP participants to advise Urbach how to vote the shares allocated to their accounts—a process required by the Plan Document. However, the notice undermined that invitation by announcing that Urbach was not required to follow participants' instructions

if he believed those instructions were contrary to his fiduciary duties. Since Urbach stated in the same notice that he had already concluded the deal was in the best interest of participants, he effectively communicated that he would vote all shares in favor of the deal regardless of the outcome of the poll.

72.    The notice further instructed participants to "rely only on the information contained" in the notice, and that no other information would be given beyond the broad statements in support of the deal contained in the notice. The board and Urbach declined to make company financials or other valuation records available to participants.

73.    Not surprisingly, given the contents and limitations of the notice, most ESOP participants did not respond to the poll. Based on the sum of unallocated shares and shares allocated to participants who did not respond to the poll, Urbach exercised sole shareholder power with respect to around 74% of outstanding shares (notwithstanding his ultimate discretion, as stated in the notice, with respect all shares regardless of participant instructions).

74.    The ultimate vote was academic given Urbach's prior decision to support the deal and control of at least 74% of outstanding shares. The deal closed on or around October 28, 2022. On behalf of Astara Capital, Barton confirmed the sale to the Orlando Business Journal on November 4, 2022.[5]

---

[5] Steven Ryzewski, New York's Astara Capital acquires Orlando-based Del-Air, ORLANDO BUSINESS JOURNAL, Nov. 4, 2022, *available at*

75.     The deal involved two parts, each contingent on the other and executed in succession.

76.     First, Del-Air was restructured such that the ESOP owned 100% of the stock of two newly created companies, Del-Air Employee Investor I, Inc. and Del-Air Employee Investor II, Inc. (hereinafter the "ESOP Entities"), which in turn owned 100% of Del-Air. As part of the restructuring, Del-Air converted from a Florida corporation to Delaware limited liability company. In the end, the ESOP, indirectly through the ESOP Entities, owned 100% of the membership interest of the converted Del-Air.

77.     Second, the ESOP Entities sold their 100% membership interest in the converted Del-Air on a debt-free basis to a newly created holding company called ACP HVAC Holdings LLC, whose membership interest was owned directly or indirectly by the Astara Fund. In exchange, the ESOP Entities received a 24% interest in ACP HVAC Holdings LLC (which, as discussed below, was incorrectly valued in the transaction at around $11.5 million), and the Astara Fund (directly or through ACP HVAC Holdings LLC or another affiliate) paid $35.5 million in cash.

78.     The $35.5 million in cash was paid out in three ways: (a) $23 million to pay off Del-Air and ESOP debts, including $9 million paid to Diane

---

https://www.bizjournals.com/orlando/news/2022/11/04/del-air-heating-air-conditioning-sold-astara-cap.html.

Dello Russo; (b) $5.55 million to pay transaction costs and provide future capital to Del-Air; and (c) $7 million to the ESOP, subject to further limitations and escrow.

79.    The limitations and escrow left only around $4 million available to ESOP participants as consideration for the sale of their shares in the deal. Of this $4 million, $2 million was set aside to pay ongoing distributions to participants who tendered their shares to the company before the deal, plus future ESOP administration expenses. Another $1 million was placed in escrow to cover a potential working capital shortfall and pay possible future claims the Astara Fund may assert against the company.

80.    The 24% stake in ACP HVAC Holdings LLC issued to the ESOP Entities is subject to a limited liability company agreement with the Astara Fund. The limited liability company agreement designates the ESOP Entities' stake to be "Class C" interests ineligible for profits distributions until the Astara Fund and its affiliates recoup their entire investment. The agreement further provides that the Astara Fund or its affiliates may buy out the ESOP Entities' interests at any time.

<em>Post-Transaction Fiduciary Structure</em>

81.    Documents available to participants do not provide clear information regarding the post-transaction fiduciary structure of the ESOP. A summary of changes distributed to participants implies that Urbach remains

25

the ESOP trustee. The summary also states that the ESOP Entities are now deemed to be the ESOP sponsor. The notice does not identify which entity or entities succeeded Del-Air as the ESOP's named fiduciary: the ESOP Entities or Del-Air's direct legal successor, the converted Del-Air controlled by the Astara Fund. No information has been provided regarding the ESOP Entities' board membership or governance of the converted Del-Air.

82.     Based on the information available at this stage, it is reasonable to infer that certain Defendants, or all of them, remain in control of the disposition of the ESOP's remaining interest in Del-Air. Any Defendant or other person who is a member of a body that controls whether the ESOP sells its remaining stake to the Astara Fund, and at what price, is a fiduciary of the post-recapitalization ESOP.

## DEFENDANTS' ACTIONS AND OMISSIONS DAMAGING TO THE ESOP

*Value of Del-Air Stock*

83.     Enterprise value is the amount needed to buy a company on a debt-free basis. A common metric for benchmarking the enterprise value of a company is the multiple of revenue method. Companies in the same industry tend to have enterprise values based on similar multiples of revenue. The ESOP historically used this method (among other inputs) to determine Del-Air's enterprise value (and from that, the stock value).

26

84.     Del-Air was generating at least $140 million in annual revenue at the time of the recapitalization, according to a public acknowledgement by Barton. Based on the average revenue multiple of around 0.5 for heating, ventilation, air conditioning, and refrigeration (HVACR) service companies, Del-Air should have been worth at least $70 million on an enterprise basis (*i.e.*, including debt).[6] This equals a stock value of at least $47 million at the time of the recapitalization, given $23 million in debt paid through the transaction.

85.     The $47 million estimate is consistent with prior stock valuations performed on behalf of the ESOP. Urbach had previously hired a valuation advisor to conduct a complete analysis of the ESOP's stock value as of year-end 2020. That report, which Urbach approved, valued the ESOP's Del-Air stock at $45.8 million.[7]

86.     Less than two years later, Defendants assigned a value of only around $18.5 million to the ESOP's stock in the recapitalization transaction. The $18.5 million price was a 60% discount compared to the stock's value at year-end 2020, and well below the industry average as a multiple of revenue.

---

[6] *See* CAPSTONE PARTNERS, *HVACR Services Sector Update* (Sept. 2022), at 12, *available at* https://www.capstonepartners.com/wp-content/uploads/2022/09/Capstone-Partners-HVACR-Services-MA-Coverage-Report_September-2022-.pdf (hereinafter "2022 HVACR Sector Update"); METRONOME PARTNERS, *HVACR Sector Focus* (2019), at 4, *available at* https://metronomepartners.com/wp-content/uploads/2019/09/HVAC-Q1-Final.pdf (hereinafter "2019 HVACR Sector Focus").

[7] The purchase price between two transactions in 2005 and 2015 was $44.7 million. Between 2005 and 2021, the ESOP received $51.5 million in contributions in order to pay the principal and interest on loans used to acquire the stock.

87.     Discovery will show that the true value of the ESOP's stock was consistent with the industry average and prior valuations, and the price paid for the ESOP's stock in the recapitalization should have been between $40 million and $50 million or more. Thus, the ESOP was shortchanged $20 million to $30 million or more in the deal.

*Consideration Received by the ESOP*

88.     The consideration received by the ESOP fell short of satisfying even the substantially discounted $18.5 million price for the ESOP's shares—let alone the fair market value of $40 million to $50 million or more.

89.     From Defendants' perspective, the $18.5 million price was satisfied by (a) Defendants' valuation of the 24% membership interest in ACP HVAC Holdings LLC issued to the ESOP Entities in the deal and (b) $7 million in cash allocated to the ESOP.

90.     But Defendants' valuation of the 24% interest issued to the ESOP Entities was flawed. Assuming Defendants' valuation of the enterprise as a whole was correct (which it was not), the ESOP was entitled to an interest in the recapitalized company worth $11.5 million, after taking the $18.5 million stock valuation and subtracting the $7 million in supposed cash consideration received by the ESOP (*see infra* ¶ 93).

91.     To determine the percentage interest in new Del-Air needed to satisfy the ESOP's sale of an $11.5 million stake in old Del-Air, Defendants

28

appear to have taken the cash paid by the Astara Fund in the deal ($35.5 million) and divided it by the ratio of the Astara Fund's interest in the recapitalized company to the ESOP Entities' interest in the same,[8] crediting the quotient[9] to the interest sold by the ESOP. Together with the $7 million in cash, this amount equaled the total value assigned to the ESOP's pre-transaction equity of around $18.5 million.

92.    Defendants' method of determining the percentage interest owed to the ESOP was unfair because it valued the Astara Fund's *controlling* interest in the recapitalized company the same as the ESOP Entities' *Class C* interest. But the interests were not equal. The value of the ESOP's Class C interest should have been steeply discounted based on (1) the Astara Fund's priority in profits distributions—and the ESOP's corresponding lack of profits distributions—under the limited liability company agreement and (2) the ESOP's lack of control over the company in light of its demotion to minority stakeholder. The ESOP needed to receive better than a 24% Class C stake in recapitalized Del-Air to make up for $11.5 million worth of stock in old Del-Air.

93.    The $7 million in cash credited to the purchase price also was not what it seemed. Nearly $2 million was earmarked to pay ongoing distributions to participants who terminated service with Del-Air prior to the

---

[8] $0.76 \div 0.24 = 3.166$
[9] $\$35,500,000 \div 3.166 = \$11,212.886.92$.

recapitalization and initiated distributions under the terms of the ESOP.[10] Section 11.4(b) of the Plan Document makes the company liable to repurchase shares from terminated participants who request distributions. Thus these pending distribution payments were pre-transaction company debts, not part of the equity value of the shares sold to the Astara Fund in the deal. The amount used to pay pending distributions should not have been credited to the value of the ESOP's shares, meaning that the ESOP was shorted an additional amount beyond the improper discounts applied on the face of the deal.

*Defendants' Process*

94.    Discovery will show that Defendants' process for determining the price of the ESOP's stock was corrupt and constituted numerous violations of ERISA.

95.    First, Barton was ineligible, as an ESOP fiduciary, to work both sides of the deal. Although he resigned from the board 10 days before the final vote, his resignation was a contrivance to avoid liability—and it came too late. Before he resigned, Barton negotiated the deal as an agent of both the seller (the ESOP) and the buyer (the Astara Fund and its affiliates) in violation of his duties as an ESOP fiduciary. His selfish interests were on the buyer's side

---

[10] The $2 million sum included future ESOP administrative expenses. Given the small amount of ESOP administrative expense typically incurred, it is reasonable to infer that nearly all of the $2 million sum set aside was used to pay pending claims.

as an investor in and operator for the Astara Fund, and he failed to advocate for a fair deal on behalf of the ESOP.

96.     Second, the deal was calculated to serve Diane Dello Russo's interest in being repaid the $9 million she was owed by the company and the ESOP. Around $5 million of the $9 million constituted notes from the ESOP for shares acquired by the ESOP in 2015. Under the terms negotiated in 2015, the ESOP was entitled to pay the notes over 30 years at the low interest rate of 2.61%. While it was in Diane Dello Russo's interest to be repaid in full in 2022, it was not in the ESOP's interest to accelerate these debts—especially if it was forced to sell the stock at a fire sale price to do so. Within 18 months of bringing Barton onto the board, Diane Dello Russo secured the immediate repayment of her loan, contrary to the ESOP's best interests. The board and Urbach failed to consider the ESOP's options objectively and gave favor to the interests of a director, Diane Dello Russo, in breach of their duties as ESOP fiduciaries.

97.     Third, Defendants failed to solicit bids from other potential buyers or consider alternatives to the sale of a controlling stake in Del-Air. In the months prior to the recapitalization of Del-Air, mergers and acquisitions in the HVACR services sector experienced a "surge." *See* 2022 HVACR Services Sector Update, at 7. Private equity firms "display[ed] an appetite in the sector due to HVACR service providers' recurring revenue and defensibility." *Id.* This

buy-side demand was expected to "attract premium valuations despite rising interest rates." *Id.*

98.    Due to the conflicts present on the board with respect to Barton and Diane Dello Russo, the ESOP fiduciaries (all board members and Urbach) were obligated to investigate alternatives to the deal presented. Had they done so, the marketplace would have produced higher offers and other financing alternatives that would have better served the interests of the ESOP and ESOP participants. The proposition that the ESOP had no choice but to sell a controlling stake to an insider at a fire sale price is not credible given the favorable market environment and Defendants' lack of effort to investigate alternatives.

99.    Fourth, the valuation process contains indicia of manipulation. During 2022, while Barton was attempting to put together the Astara Fund deal, Urbach and his advisor were due to determine the value of the ESOP's stock as of year-end 2021. This annual valuation process was delayed by the board, and the board ultimately replaced the initial set of financial results and assumptions conveyed to Urbach with a new set of financials that weakened Del-Air's 2021 results and future projections. The result was that Urbach issued a valuation report shortly before the recapitalization deal that found a 50% decrease in the value of the ESOP's stock during 2021, and then relied on the same revised financials to support the recapitalization deal.

100.   Discovery will show that Barton and the board manipulated the revised financials to obtain a reduced valuation that would support the discounted sale price that they were constructing on a parallel track. Urbach had the requisite knowledge to question these manipulated financials—having assessed and approved a valuation the year before that was more than twice as high—but instead rubber stamped them.

101.   Fifth, factors cited by the board and Urbach to justify the deal, and the cut-rate valuation at the center of it, are dubious and self-serving. The board and Urbach cited the COVID-19 pandemic to explain the slashed valuation, but this narrative does not withstand basic scrutiny. The year-end 2020 ESOP valuation—covering the period when pandemic disruptions were most acute—did not find the stock to have decreased in value (instead, the stock increased $4.3 million from year-end 2019). Further, market analysts found that the pandemic *helped* HVACR valuations by increasing demand for indoor air quality solutions. *See* 2022 HVACR Sector Update, at 5.

102.   The board and Urbach also cited supply chain disruptions and rising interest rates. While these short-term challenges were acknowledged by industry analysts at the time, company valuations were not materially affected. *See id.* at 6–7 & 12; 2019 HVACR Sector Focus, at 4. Rather than lend support for the deal, the supposed justifications presented by the board and Urbach underscore their self-serving manipulations and lack of due diligence.

*The Future Buyout*

103.   Defendants also improperly granted the Astara Fund the right to buy out the ESOP's interest in the recapitalized Del-Air at any time, without seeking additional consideration or protection for the ESOP. Based on the ESOP fiduciaries' performance in connection with the recapitalization, ESOP participants are in jeopardy that their remaining retirement benefit tied to their company will be liquidated at a fraction of its true value. Discovery will show that the procedural safeguards and fiduciary personnel currently in place are insufficient to protect the ESOP from further damages in connection with a future buyout.

**PLAN-WIDE RELIEF**

104.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the ESOP pursuant to this statutory provision.

105.   Plaintiffs seek recovery for injuries to the ESOP sustained as a result of prohibited transactions and fiduciary breaches and seek equitable relief on behalf of the ESOP as a whole pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

106.   Plaintiffs are adequate to bring this derivative action on behalf of the ESOP, and their interests are aligned with other participants and

beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the ESOP.

## **CLASS ACTION ALLEGATIONS**

107.  Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

108.  Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the ESOP defined as follows:

> All participants and beneficiaries of the ESOP at the time of the recapitalization of Del-Air, excluding any Defendant or employee of Del-Air with fiduciary responsibility on behalf of the ESOP related to the recapitalization.

109.  <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had around 1,000 participants.

110.  <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were ESOP participants, and Plaintiffs suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

111. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

112. <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.  Whether the Defendants were fiduciaries with respect to the ESOP and the scope of their fiduciary duties;

b.  Whether the ESOP's fiduciaries failed to comply with the fiduciary standards of prudence and loyalty;

c.  Whether the Astara Fund and ACP HVAC Holdings LLC were obligated to provide adequate consideration for the purchase of ESOP assets;

d.  Whether the Astara Fund and ACP HVAC Holdings LLC provided adequate consideration for the purchase of ESOP assets;

e.  Whether Barton and Diane Dello Russo were parties in interest to the ESOP;

36

f.   Whether the transfer and sale of the ESOP's ownership interest in Del-Air constituted one or more prohibited transactions;

g.   Whether Defendants profited from Defendants' violations of ERISA;

h.   The proper form of equitable and injunctive relief; and

i.   The proper measure of monetary relief.

113.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

114.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

115.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing individual actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single case.

116.   Plaintiff and his undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## CAUSES OF ACTION

### Count I
### 29 U.S.C. § 1106(a)
*Against Barton, Diane Dello Russo, Fortin, Brinkley, and Urbach*

117.   The transfer and sale of the ESOP's interest in Del-Air for the benefit of Diane Dello Russo and Richard Barton, parties in interest to the

ESOP, constituted one or more prohibited transactions in violation of 29 U.S.C. § 1106(a)(1)(A) & (D).

118.   Barton, Diane Dello Russo, Fortin, and Brinkley caused the prohibited transactions in their capacities as the ESOP fiduciaries responsible for recommending Urbach, as trustee, to transfer the ESOP's shares in the deal. Defendant Urbach also caused the prohibited transactions in his capacity as the ESOP fiduciary who ultimately voted for and executed the transfer on behalf of the ESOP.

119.   The circumstances around the transaction show that the consideration provided for the ESOP shares in the recapitalization was inadequate and below-market value.

120.   Barton, Diane Dello Russo, Fortin, Brinkley, and Urbach caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses. Barton and Diane Dello Russo profited from the above-mentioned prohibited transactions and are liable to the ESOP for their profits. They are also liable for appropriate equitable relief to be determined by the Court.

### Count II
### 29 U.S.C. § 1106(b)
*Against Barton, Diane Dello Russo, Fortin, Brinkley, and Urbach*

121.   Barton dealt with ESOP assets for his own benefit in violation of 29 U.S.C. § 1106(b)(1) by negotiating the recapitalization transaction that

benefited him personally through his interest in the Astara Fund. He also acted on behalf of interests adverse to the ESOP—the Astara Fund and its affiliates—in the process of negotiating the recapitalization transaction, in violation of 29 U.S.C. § 1106(b)(2). He further violated 29 U.S.C. § 1106(b)(3) by receiving consideration—his indirect interest in ACP HVAC Holdings LLC or incentive compensation tied to the deal—from a parting dealing with the ESOP in connection with a transaction involving assets of the ESOP.

122.   Diane Dello Russo dealt with ESOP assets for her own benefit in violation of 29 U.S.C. § 1106(b)(1) by approving the recapitalization transaction in order to promptly accelerate and pay ESOP notes and other loans that were not yet due to her. She further violated 29 U.S.C. § 1106(b)(3) by receiving consideration—the accelerated note payments—from a party dealing with the ESOP in connection with a transaction involving assets of the ESOP.

123.   The circumstances around the transaction show that the consideration provided for the ESOP shares in the recapitalization transaction was inadequate and below-market value.

124.   Fortin, Brinkley, and Urbach knew that Barton and Diane Dello Russo engaged in improper fiduciary self-dealing in violation of 29 U.S.C. § 1106(b). Fortin, Brinkley, and Urbach failed to take appropriate steps, such as soliciting independent acquisition bids or financing proposals, to remedy

Barton and Diane Dello Russo's self-dealing. Fortin, Brinkley, and Urbach are therefore jointly liable, pursuant to 29 U.S.C. § 1105(a), with Barton and Diane Dello Russo for their violations of 29 U.S.C. § 1106(b).

125. Barton and Diane Dello Russo caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses. Barton and Diane Dello Russo also profited from the above-mentioned prohibited transactions and are liable to the ESOP for their profits. Fortin, Brinkley, and Urbach are jointly liable with Barton and Diane Dello Russo. All are also liable for appropriate equitable relief to be determined by the Court.

### Count III
### 29 U.S.C. § 1104(a)(1)
*Against Barton, Diane Dello Russo, Fortin, Brinkley, and Urbach*

126. Barton, Diane Dello Russo, Fortin, Brinkley and Urbach, as board members and the ESOP trustee, were responsible for obtaining a fair price on behalf of the ESOP in the recapitalization transaction.

127. Barton, Diane Dello Russo, Fortin, and Brinkley, as board members, failed to act prudently and solely in the interest of ESOP participants in this process. They created misleading revised financials for Urbach intended to produce an artificially low valuation to support the deal. They declined to allow participants access to the underlying financials and valuation analysis. Barton led negotiations and acted in his own interest, and

contrary to the ESOP's interest, by identifying his firm as a potential deal partner for the ESOP and working to construct the deal on terms favorable to himself and his co-investors. Diane Dello Russo acted in her own interest and contrary to the interest of the ESOP by prioritizing the acceleration and payment in full of her notes. All board members acted imprudently by failing to solicit independent bids despite conflicts of interest on the board in the connection with the proposed deal. All board members acted imprudently by failing to scrutinize the consideration credited toward the valuation of the ESOP's shares. All board members acted imprudently by failing to negotiate appropriate consideration or procedural safeguards in the connection with the Astara Fund's right to buy out the ESOP's remaining interest in Del-Air. Diane Dello Russo, Fortin, and Brinkley acted imprudently by ultimately voting to approve the deal on behalf of the ESOP and by recommending Urbach to vote in favor of the deal in his capacity as ESOP trustee.

128.   Urbach, as ESOP trustee, failed to act prudently on behalf of the ESOP. He accepted the board's self-serving revisions to the company's financials without appropriate scrutiny. He voted the ESOP's shares in favor of the deal, and communicated to ESOP participants that he would do so in advance of the participant poll, despite known conflicts of interest on the board and the absence of any independent bidding process.

129.   Had Defendants performed their fiduciary duties in the prudent and loyal manner required by ERISA, Plaintiffs and other ESOP participants would have received additional consideration in the recapitalization, or would have retained all or a larger part of their stake in Del-Air.

130.   Barton, Diane Dello Russo, Fortin, Brinkley, and Urbach caused losses to the ESOP resulting from the above-mentioned fiduciary breaches and are liable to the ESOP for those losses. Barton and Diane Dello Russo also profited from the above-mentioned fiduciary breaches and are liable to the ESOP for their profits. All are also liable for appropriate equitable relief to be determined by the Court.

## Count IV
### 29 U.S.C. § 1132(a)(3)
*Against Barton, Diane Dello Russo, and the Astara Fund*

131.   Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations[.]" Such "appropriate equitable relief" includes recovering proceeds of a fiduciary violation from a knowing participant in the violation. *See Harris Trust*, 530 U.S. at 238; *Placht*, 2022 WL 3226809, at *11.

132.   Without regard to their own status as fiduciaries, Barton, Diane Dello Russo, and the Astara Fund had knowledge of the circumstances that rendered the recapitalization transaction unlawful and knowingly accepted proceeds of those violations. Barton purposefully constructed the deal as a

43

company director to pay less than fair market value to the ESOP in order to enjoy a windfall through his interest in the Astara Fund. The Astara Fund likewise had knowledge of its windfall through its agent, Barton, and knew that he acted unlawfully as an ESOP fiduciary and party in interest in the connection with the deal. Diane Dello Russo knew that the notes paid to her in full through the deal were not due and that it was not interest of the ESOP to liquidate at a fire sale price in order to accelerate her note payments. Barton, Diane Dello Russo, and the Astara Fund also knew that no fiduciary conducted a competitive bidding process despite conflicts of interest on the board during the construction of the deal, and that the board and Urbach approved the transaction despite this failure. Barton, Diane Dello Russo, and the Astara Fund therefore received proceeds of the recapitalization knowing that those proceeds were fruits of violations of 29 U.S.C. §§ 1106(a), 1106(b), and 1104(a)(1).

133.  The illicit proceeds received by Barton, Diane Dello Russo, are identifiable. The Astara Fund received and holds its proceeds in the form of membership interests in ACP HVAC Holdings LLC. Barton received and holds his proceeds in the form of partnership interests in the Astara Fund, or cash incentive compensation paid in connection with closing. Diane Dello Russo's proceeds constitute cash paid at closing in premature satisfaction of her notes.

Such proceeds, and profits derived from such proceeds, may be traced, if necessary, through successive changes in form through the discovery process.

134.   Pursuant to principles of equity, as adopted and applied by federal courts in ERISA cases, Barton, Diane Dello Russo, and the Astara Fund are liable to the ESOP, without regard to their status as fiduciaries or liability under 29 U.S.C. § 1109(a), for undue proceeds of violations of ERISA, and profits thereon.

## **PRAYER FOR RELIEF**

135.   Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.   Certify Plaintiffs' authority to seek plan-wide relief on behalf of the ESOP pursuant to 29 U.S.C. § 1132(a)(2);

B.   Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiffs as class representatives, and certify their counsel as class counsel;

C.   Order Defendants to make good to the ESOP all losses resulting from their violations of ERISA;

D.   Order Barton and Diane Dello Russo to disgorge all profits received through use of the assets of the ESOP;

E.   Impose a constructive trust or equitable lien or surcharge with respect to, and an accounting of, all proceeds of fiduciary breaches and prohibited transactions received by Barton, Diane Dello Russo, or the Astara Fund, and all resulting profits;

F.   Appoint an independent trustee of the ESOP to oversee the allocation of losses, profits, and proceeds recovered on behalf of the ESOP to ESOP participants, consistent with

the terms of the ESOP and ERISA;

G.   Approve a fair and equitable plan of allocation of any losses, profits, or proceeds recovered on behalf of the ESOP to ESOP participants;

H.   Remove Defendants from any fiduciary positions with respect to the ESOP;

I.   Enjoin the Astara Fund from buying the ESOP's interest in ACP HVAC Holdings LLC;

J.   Order that any future sale of the ESOP's interest in ACP HVAC Holdings LLC be subject to appropriate procedural safeguards;

K.   Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

L.   Award prejudgment and post-judgment interest; and

M.   Award such other and further relief as the Court deems just and equitable.


DATED: March 24, 2023          Respectfully Submitted

/s/ *Marc R. Edelman*
**MARC R. EDELMAN, ESQ.**
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone 813-223-5505
Fax: 813-257-0572
Email: MEdelman@forthepeople.com

/s/ *C. Ryan Morgan*
**C. RYAN MORGAN, ESQ**,
FBN 0015527
**MORGAN & MORGAN, P.A.**

46

20 N. Orange Ave., 15th Floor
Orlando, FL 32801
T: (407) 420-1414
F: (407) 245-3401
Email: RMorgan@forthepeople.com

**/s/ JAMES J.  HENSON**
**JAMES J. HENSON**, Esq.
Florida Bar No.: 77476
**MORGAN & MORGAN, P.A**.
20 N. Orange Avenue, Suite 1600
Orlando, FL 32802
Telephone (407) 428-6241
Fax: (407) 245-3342
Email: jjhenson@forthepeople.com

*/s/ Carl F. Engstrom*
**CARL F. ENGSTROM** (*pro hac vice
motion forthcoming*)
Minn. Bar No. 0396298
**ENGSTROM LEE MCDONOUGH
THOMPSON & THOMSON LLC**
729 N Washington Ave, Suite 600
Minneapolis, MN 55401
Telephone: 612-305-8349
cengstrom@engstromlee.com
mthomson@engstromlee.com

*Attorneys for Plaintiffs*

47