## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| Julissa Ovalle, Lynne Cassani, Angel Buitrago, Michael Mize, Cynthia Medina, Wiltron Diaz, Jerry Raymond, Angel Soto, Thomas Cannetti, and Blaine Ifill as representatives of a class of similarly situated persons, and on behalf of the Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning and Refrigeration, Inc., | Case No. 6:23-cv-551-CEM-RMN **FIRST AMENDED COMPLAINT** **CLASS ACTION** **DECLARATORY RELIEF REQUESTED** |
| Plaintiffs, | |
| v. | |
| Howard Barton, Diane Dello Russo, Donald Fortin, Charles Brinkley, Tony Hartsgrove, James Urbach, Del-Air Heating, Air Conditioning & Refrigeration, LLC, as successor in interest to Del-Air Heating, Air Conditioning and Refrigeration, Inc., and Astara Capital Partners Fund I, L.P., | |
| Defendants. | |

## NATURE OF THE ACTION

1.      Plaintiffs Julissa Ovalle, Cynthia Cassani, Angel Buitrago, Michael Mize, Cynthia Medina, Wiltron Diaz, Jerry Raymond, Angel Soto, Thomas Cannetti, and Blaine Ifill ("Plaintiffs"), as representatives of the Class described herein, and on behalf of the Employee Stock Ownership Plan and Trust for the Employees of Del-Air Heating, Air Conditioning and Refrigeration, Inc. (the "ESOP"), bring this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants Howard Barton, Diane Dello Russo, Tony Hartsgrove, Donald Fortin, Charles Brinkley, (collectively, "Director Defendants") James Urbach, Del-Air Heating, Air Conditioning & Refrigeration, LLC, as successor in interest to Del-Air Heating, Air Conditioning and Refrigeration, Inc. ("Del-Air") (collectively with Director Defendants and Urbach, "Fiduciary Defendants") and Astara Capital Partners Fund I, L.P. ("Astara Fund").

2.      As described herein, Defendants forced the ESOP to sell control of Del-Air for less than fair market value to an investment fund, the Astara Fund, in the wake of the company founder's death. ("Astara transaction"). Instead of acting in the interest of Del-Air employees, Defendants looked out for their own interests, looked the other way, or knowingly profited from the unfair deal.

3.      In the alternative, Defendants tolerated corporate waste and neglect for years, causing Del-Air's EBITDA to decline by ██ in less than three years. When the value of Del-Air was at its nadir, the Astara Fund seized the opportunity to acquire the company "for a discount to comparable transactions," giving the Astara Fund the

"potential for outsized returns." This was no accident. Barton was a director of Del-Air during this period of rapid decline and then became an investor in the Astara Fund that would acquire Del-Air at the "significant discount" because of the "significant undermanagement" that Barton tolerated, if not precipitated. The Fiduciary Defendants' failure to intervene to protect the ESOP's investment was a breach of its fiduciary duties.

4.      As a result, Plaintiffs and other ESOP participants lost as much as $50 million, constituting over 80% of their total retirement benefits. Plaintiffs bring this action on behalf of the ESOP, and on behalf of ESOP participants as a class, to recover lost benefits, remedy Defendants' unlawful conduct, and prevent future harm to the ESOP.

## INTRODUCTION

5.      Del-Air was founded as Del-Air Heating, Air Conditioning and Refrigeration, Inc. in 1983 by Robert "Bob" Dello Russo ("Bob"). Del-Air provides heating, air conditioning, refrigeration, plumbing, and electrical services to homeowners and builders.

6.      In two transactions, the first in 2005 and the second in 2015, Bob sold the company to Del-Air employees through the ESOP. After the two transactions were completed, the ESOP owned 100% of Del-Air's stock for a total purchase price of $44.7 million.

7.      At the end of 2020, the company had over 1,000 employee-owners and the ESOP's stock was valued at $45.8 million.

8. In 2021, Bob died. After his death, the company's board of directors consisted of his wife, Defendant Diane Dello Russo ("Diane"); his brother-in-law, Defendant Donald "Richard" Fortin; his business partner, Defendant Howard "Chad" Barton; and his banker, Defendant Charles Brinkley.

9. Rather than guide the company for the benefit of Del-Air's employee-owners as ERISA demands, the directors pursued their own interests, or allowed their co-directors to do so, at the ESOP's expense.

10. Diane was a creditor to the ESOP and the company and wanted her loans to be accelerated and paid in full. And Barton had recently exited another business venture with Bob and private equity investors and was looking for a new investment.

11. Barton orchestrated the Astara transaction, a recapitalization of Del-Air that transferred a 76% ownership stake to himself and co-investors (through the Astara Fund) at a steep discount and paid Diane's loans immediately and in full. Fortin and Brinkley stood by and allowed this self-serving transaction to proceed (to the extent they did not participate in it personally). The ESOP's independent trustee, Defendant James Urbach, sanctioned this heist and failed to protect the ESOP.

12. In the alternative, discovery will reveal Barton secured his discounted price by condoning or precipitating corporate waste, leaving Del-Air to be managed by a "CFO and CEO [who] don't understand the business" like a "747 w/o a pilot that's continuing to fly with no one at the controls."

13. The Astara transaction stripped the ESOP of its stock at a fire sale price of $18.5 million, far less than its fair market value of between $40 and $50 million or

more. The board did not shop the company in the marketplace or investigate alternatives to a sale for the benefit of ESOP participants. Discovery will show that Barton was determined to capture the company at a discounted price for himself and his co-investors and manipulated the company's financials and the board and trustee's review of the company's options, and/or tolerated corporate waste, to achieve that result.

14.     In reality, the ESOP received far less than $18.5 million for its shares. Nearly $2 million of that sum was used to satisfy the company's pre-transaction debt to participants who had initiated distributions that the company was liable to fund. By subtracting this sum from the consideration received by the ESOP for its shares, Defendants unfairly lopped off even more from the fire sale price the ESOP received.

15.     Defendants also counted the ESOP's 24% stake in recapitalized Del-Air toward the $18.5 million price. However, Defendants valued the ESOP's 24% stake as being worth roughly $11.4 million of the $18.5 million price without applying appropriate discounts for the ESOP's lack of near-term profits participation and loss of control. The 24% minority stake issued to the ESOP was designated "Class C" and is ineligible for profits distribution until the Astara Fund recoups its entire investment. Given these debilities, the ESOP was owed either more stock or more cash to make up for the value transferred to the Astara Fund. The ESOP received only $5 million in cash, after the prior obligations had been paid, roughly 10% of what its shares were valued at less than two years prior.

5

16.    In addition to damages caused to date, Plaintiffs and other ESOP participants face substantial risk of future harm. The Astara transaction set a clock for the ESOP's remaining stake in Del-Air to be liquidated starting no later than 2028. Under the deal, the Astara Fund may buy out the ESOP's stake at any time. So long as Defendants occupy fiduciary positions with respect to the ESOP and the Astara Fund is permitted to acquire the ESOP's stake, Plaintiffs and other participants risk being shortchanged their ESOP benefits yet again.

17.    The Fiduciary Defendants all had fiduciary duties pursuant to ERISA to act in the interest of ESOP participants and with due care. They failed to satisfy their duties and are liable to the ESOP for its losses and any undue profits they received. They also should be removed from any fiduciary positions with respect to the ESOP given the potential for further harm related to the liquidation of ESOP's remaining shares.

18.    The Astara Fund knowingly profited from its co-Defendants' fiduciary violations and should not be permitted to retain its windfall or acquire additional shares from the ESOP.

19.    Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1104, 1106 & 1132(a)(2)-(3) to remedy Defendants' unlawful conduct, recover losses to the ESOP, prevent further harm to the ESOP, and obtain other appropriate relief.

## JURISDICTION AND VENUE

20.    Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that participants in an employee benefit plan may pursue a civil action

6

on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

21.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

22.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the ESOP was administered in this district and several of the fiduciary breaches occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

23.     The Plan provides claim procedures that claimants must exhaust before filing suit.

24.     Plaintiffs have exhausted their administrative remedies. They submitted an Administrative Complaint to the Plan Administrator on July 6, 2023. The Plan Administrator denied Plaintiffs' request for relief on December 22, 2023. Plaintiffs filed their appeal of administrative complaint denial on July 5, 2024. The Plan Administrator denied that appeal on November 1, 2025.

25.     After the denial of Plaintiffs' initial claim for relief, Plaintiffs served on Defendants requests for the production of documents and interrogatories. The Plan Administrator did not respond to Plaintiffs' interrogatories. As to documents, the Plan Administrator refused to produce all requested documents and instead allowed itself and Defendants to unilaterally decide which documents to produce, withhold, or redact.

26.    For example, Plaintiffs requested and were denied documents and communications relating to the Astara transaction and other bids, Barton's appointment to and resignation from the Board, loans or other advances provided by Diane, and, crucially, Barton's involvement in the 2022 Astara transaction. Plaintiffs were also denied materials relating to the fiduciary processes undertaken by the Board and Trustee Defendants. No board minutes were produced other than the 2015 action related to creation of the ESOP. ESOP trustee minutes were produced for only one meeting on October 30, 2022.

27.    Instead, the Plan Administrator relied on a subset of documents provided by parties who are adverse to Plaintiffs and who have a financial incentive for Plaintiffs' claims to fail, without reviewing or even discussing their methodology for locating relevant documents, or demanding that those parties provide all relevant documents rather than only those documents that support their preferred version of events. This is irreconcilable with the Plan Administrator's duty of loyalty to the beneficiaries of the ESOP.

28.    In refusing to produce all relevant documents and information requested by Plaintiffs, the Plan Administrator relied on 29 C.F.R. §§ 2560.503-1(h)(2)(iii) and (m)(8), which concerns administrative review of *individual benefit determinations* such as health and disability insurance claims. *See id.* at (a) (explaining that "this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries"). That provision does not apply here, where every claim alleges a prohibited transaction or a breach of fiduciary duties.

8

In benefit determinations, the applicant has independent access to the relevant documents, such as the applicant's medical, treatment, and employment records, and medical evaluations. Here, Plaintiffs' claims of breaches of fiduciary duties and prohibited transactions require documents solely in the possession of the Plan Administrator and Defendants.

29.    The Plan Administrator also did not appear to take any steps to mitigate its obvious conflict of interest. The Plan Administrator's review appears to have been performed by Del-Air's CEO and potentially also its general counsel. The majority owner of Del-Air is Astara Capital Partners ("Astara Capital"), whose investment fund is a Defendant. Astara Capital's authority to remove officers of the company through its control of the board created obvious pressure on Del-Air's officers to reach a conclusion that would not have an adverse effect on Astara Capital. Further, the administrative review process was led by Del-Air's current CEO, Rick Rogers, who also worked for Defendant Astara Capital as a consultant in the lead-up to the Del-Air purchase.

30.    Finally, the Plan Administrator failed to investigate or even consider additional wrongdoing revealed by the documents submitted by Defendants and identified by Plaintiffs within the appeal brief. The productions revealed mismanagement of the corporation including waste and self-dealing by the Board of Directors that was ignored by the Trustee, and that the Board Defendants failed to report to the Plan, as was their duty. *See infra* ¶¶ 142–63. Plaintiffs' appeal brief identified this evidence and explained the additional claims that it gave rise to. The

Plan Administrator's denial of the appeal brief made no mention of this evidence or of the claims of misconduct by the company and its directors, or the trustee's failure to rectify that misconduct.

31.     The Plan Administrator's refusal to produce all relevant information requested by Plaintiffs, guard against conflicts of interest, and consider allegations and evidence cited in Plaintiffs' appeal brief prevented it from conducting a "full and fair review" of Plaintiffs' claims, as required by 29 C.F.R. § 2560.503-1. *See Molla v. Gerdau Ameristeel US, Inc.*, No. 8:22-CV-2094-VMC-SPF, 2024 WL 3626195, at *7–8 (M.D. Fla. July 17, 2024), *report and recommendation adopted*, No. 8:22-CV-2094-VMC-SPF, 2024 WL 4249422 (M.D. Fla. Sept. 20, 2024); *Rhode v. CSX Transp., Inc.*, No. 3:20-CV-480-J-34MCR, 2020 WL 10457820, at *2 (M.D. Fla. Oct. 20, 2020); 29 C.F.R. § 2560.503-1(h)(2).

## PARTIES

*Plaintiffs*

32.     Plaintiff Julissa Ovalle is a natural person residing in Apopka, Florida. She worked for Del-Air between 2000 and 2022 and has a current account in the ESOP. She lost more than half the value of her ESOP benefits through the Astara transaction. She faces ongoing risk that her ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

33.     Plaintiff Lynne Cassani is a natural person residing in Sanford, Florida. She worked for Del-Air between 2012 and 2022 and has a current account in the ESOP. She lost more than half the value of her ESOP benefits through the Astara

transaction. She faces ongoing risk that her ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

34.    Plaintiff Angel Buitrago is a natural person residing in Orlando, Florida. He worked for Del-Air between 2015 and 2022 and has a current account in the ESOP. He lost more than half the value of his ESOP benefits through the Astara transaction. He faces ongoing risk that his ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

35.    Plaintiff Michael Mize is a natural person residing in Statesboro, Georgia. He worked for Del-Air between 2017 and 2021 and has a current account in the ESOP. He lost more than half the value of his ESOP benefits through the Astara transaction. He faces ongoing risk that his ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

36.    Plaintiff Cynthia Medina is a natural person residing in Deltona, Florida. She worked for Del-Air between 2019 and 2023 and has a current account in the ESOP. She lost more than half the value of her ESOP benefits through the Astara transaction. She faces ongoing risk that her ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

37.    Plaintiff Wiltron Diaz is a natural person residing in Kissimmee, Florida. He worked for Del-Air between 1995 and 2022 and has a current account in the ESOP. He lost more than half the value of his ESOP benefits through the Astara transaction. He faces ongoing risk that his ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

38.    Plaintiff Jerry Raymond is a natural person residing in Kissimmee, Florida. He worked for Del-Air between 2008 and 2012 and has a current account in the ESOP. He lost more than half the value of his ESOP benefits through the Astara transaction. He faces ongoing risk that his ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

39.    Plaintiff Angel Soto is a natural person residing in Kissimmee, Florida. He has been employed by Del-Air since February 2002, and has a current account in the ESOP. He lost more than half the value of his ESOP benefits through the Astara transaction. He faces ongoing risk that his ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

40.    Plaintiff Thomas Cannetti is a natural person residing in Deltona, Florida. He has been employed by Del-Air since 1994 and has a current account in the ESOP. He lost more than half the value of his ESOP benefits through the Astara transaction. He faces ongoing risk that his ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

41.    Plaintiff Blaine Ifill is a natural person residing in Kissimmee, Florida. He has been employed by Del-Air since 2002 and has a current account in the ESOP. He lost more than half the value of his ESOP benefits through the Astara transaction. He faces ongoing risk that his ESOP account's remaining stake in Del-Air will be liquidated for less than fair value by Defendants.

*The ESOP*

42.    Plaintiffs sue derivatively on behalf of the ESOP pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).[1]

43.    The ESOP was established effective January 1, 2005 by Del-Air. It is administered at Del-Air's headquarters in Sanford, Florida.

44.    The ESOP is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); an "individual account plan" as defined by 29 U.S.C. § 1002(34) (also known as "defined contribution plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6).

45.    The ESOP's participants are Del-Air employees who met minimum age and service requirements prior to the recapitalization of Del-Air on or around October 28, 2022. Del-Air is thus the ESOP "employer" within the meaning of 29 U.S.C. § 1002(5). The purpose of the ESOP is to allow Del-Air employees to be beneficial owners of Del-Air stock and receive retirement benefits pro rata based on the value of Del-Air stock.

46.    Upon the Astara transaction on or around October 28, 2022, all ESOP participants were deemed to have terminated employment with Del-Air (even if they continued to work for recapitalized Del-Air), and the ESOP was closed to new participants. As a result, all ESOP participant accounts are due to be distributed starting no later than 2028.

---

[1] To the extent that any relief sought in this action is not available under 29 U.S.C. §§ 1109(a) and 1132(a)(2), Plaintiffs alternatively and additionally seek relief pursuant to 29 U.S.C. § 1132(a)(3).

*Defendants*

47.     Defendant Howard "Chad" Barton is a natural person residing in New Smyrna Beach, Florida. He was a member of Del-Air's board of directors between June 2021 and October 1, 2022. As a member of the board, Barton was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H). Likewise, he was a fiduciary of the ESOP due to fiduciary responsibilities delegated to the board by the company and functional control he exercised with respect to the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra* ¶¶ 80–83, 88–103). *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1). Moreover, as an investor in the Astara Fund, Barton received an indirect interest in Del-Air through the Astara transaction. Alternatively, he had an interest in the Astara transaction through incentive compensation paid by the Astara Fund or its affiliates in connection with the deal.

48.     Defendant Diane Dello Russo is a natural person residing in Longwood, Florida. She was a member of Del-Air's board of directors at the time of the Astara transaction on or around October 28, 2022. As a member of the board, Diane was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H). Likewise, she was a fiduciary of the ESOP due to fiduciary responsibilities delegated to the board by the company and control she exercised with respect to the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra* ¶¶ 80–83, 88–103). *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1). As a creditor of Del-Air and the ESOP, she received $9 million in the recapitalization of Del-Air.

49.    Defendant Donald "Richard" Fortin is a natural person residing in Heathrow, Florida. He was the chairman of Del-Air's board of directors at the time of the Astara transaction on or around October 28, 2022. As a member of the board, Fortin was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H). Likewise, he was a fiduciary of the ESOP due to fiduciary responsibilities delegated to the board by the company and control he exercised with respect to the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra* ¶¶ 80–83, 88–103). *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1).

50.    Defendant Charles Brinkley is a natural person residing in Lake Mary, Florida. He was a member of Del-Air's board of directors at the time of the Astara transaction on or around October 28, 2022. As a member of the board, Brinkley was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H). Likewise, he was a fiduciary of the ESOP due to fiduciary responsibilities delegated to the board by the company and control he exercised with respect to the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra* ¶¶ 80–83, 88–103). *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1).

51.    Defendant Tony Hartsgrove is a natural person residing in Orlando, Florida. He was a member of Del-Air's board of directors at the time of the Astara transaction on or around October 28, 2022. As a member of the board, Hartsgrove was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H). Likewise, he was a fiduciary of the ESOP due to fiduciary responsibilities delegated to the board by the company and control he exercised with respect to the disposition of the ESOP's stock

in the recapitalization of Del-Air (*see infra* ¶¶ 80–83, 88–103). *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1). Moreover, Hartsgrove was an advisor for the Astara Fund, conducted due diligence for the transaction on the Astara Fund's behalf, and then continued to serve on Del-Air's board of directors after the Astara transaction. Despite having knowledge as a board member that Del-Air had poor leadership and a CFO and CEO who did not understand the HVAC business, Hartsgrove failed to inform the trustee or other ESOP fiduciaries of Del-Air's mismanagement, or take any action to attempt to replace the poorly performing managers, choosing instead to convey this information to the Astara Fund, so that it could profit from purchasing Del-Air at an artificially low price, as did Hartsgrove, through consulting fees and incentive compensation.

52.    Defendant James Urbach is a natural person residing in Atlantic Beach, Florida. He has been the ESOP's independent trustee since around 2012. He acted as a fiduciary of the ESOP under the terms of the ESOP and by exercising control with respect to the management and oversight of the Plan's assets and the disposition of the ESOP's stock in the recapitalization of Del-Air (*see infra* ¶¶ ¶¶ 80–84, 88–103). *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii), 1102(a)(2), and 1105(c)(1). As trustee, Urbach was given broad discretionary authority to do all acts that he deemed to be in the best interests of the Plan.

53.    Defendant Del-Air Heating, Air Conditioning & Refrigeration, LLC, as successor in interest to Del-Air Heating, Air Conditioning and Refrigeration, Inc. is a Delaware limited liability corporation that was a Florida corporation named Del-Air

Heating, Air Conditioning and Refrigeration, Inc. prior to its conversion to a Delaware limited liability company on approximately October 27, 2022. As the Plan sponsor and the employer of Plan participants, Del-Air was a party in interest 29 U.S.C. § 1002(14)(H). Del-Air was the Plan Administrator pursuant to Section 13.1 of the Plan Document because no party was appointed as the Plan Administrator. Pursuant to Section 14.1 of the Plan Document, Del-Air was also responsible for appointing and removing the Plan's trustee, as well as communicating with the Trustee relating to the performance of their duties for the Plan as well as any information the company possessed regarding actions that risked impairment of the Plan's assets. Pursuant to these duties, Del-Air was a named fiduciary of the Plan pursuant to 29 U.S.C. § 1105(a) as well as a functional fiduciary pursuant to 29 U.S.C. § 1002(21).

54.    Defendant Astara Capital Partners Fund I, L.P. is a limited partnership organized under the laws of the state of Delaware in April 2022. Presently, following the Astara transaction, the Astara Fund is the indirect majority owner of Del-Air.

## ERISA OVERVIEW

*29 U.S.C. § 1106(a)*

55.    ERISA prohibits transactions between a plan and a party in interest, and transactions designed to benefit a party in interest. *See* 29 U.S.C. §§ 1106(a)(1)(A) & (D).

56.    ERISA's prohibition on party in interest transactions is excused only if the fiduciaries and other participants to the transaction can prove that the plan received "adequate consideration" in the deal. *See* 29 U.S.C. § 1108(e)(1); *Montgomery v. Aetna*

17

*Plywood, Inc.*, 39 F. Supp. 2d 915, 935 (N.D. Ill. 1998) ("[D]efendants bear the burden of proving that the transaction [redeeming ESOP shares] was fair and of benefit to the ESOP shareholders.").

57.     "Adequate consideration" is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." 29 U.S.C. § 1002(18); *see also Montgomery*, 39 F. Supp. 2d at 919 ("It must be shown that they arrived at their determination of adequate consideration in good faith by way of a prudent investigation and the application of sound business principles of evaluation.").

58.     "Fair market value" is customarily considered to be "the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for such asset." *See* Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17637 (May 17, 1988).[2]

59.     The sale of ESOP assets is a prohibited transaction if it is designed to benefit a party in interest, as such a transaction constitutes the "use" of plan assets for the benefit of a party in interest, and the "indirect … transfer" of plan assets to the

---

[2] Courts and practitioners customarily use this definition for guidance, although the regulation was never enacted. *See Brundle v. Wilmington Tr.*, 919 F.3d 763, 770 (4th Cir. 2019), as amended (Mar. 22, 2019) ("Department of Labor (DOL) has proposed, but never enacted, regulations" defining "adequate consideration." Nonetheless, "courts look to these regulations for guidance"); *Montgomery*, 39 F. Supp. 2d at 936–37 (citing unenacted regulation).

party in interest. *See Carter v. San Pasqual Fiduciary Trust Co.*, 2016 WL 6803768, at *6 (C.D. Cal. Apr. 18, 2016) (company directors "caused … [the company] to redeem [the company's] stock held by the Plan" in order to sell that stock to a third party and thereby "indirectly transferred Plan assets to [themselves]" because the directors received consideration from the third-party buyer); *Montgomery*, 39 F. Supp. 2d at 939 (company director that benefited indirectly from ESOP redemption was "clearly liable for having failed to sell the [ESOP's] stock [back to the company] for adequate consideration.").

### *29 U.S.C. § 1106(b)*

60.     ERISA also demands that fiduciaries "shall not" act for their own account or otherwise act adversely to a plan. *See* 29 U.S.C. § 1106(b).

61.     Specifically, a fiduciary "shall not" "deal with the assets of the plan" for their own interest or account (§ 1106(b)(1)); "act . . . on behalf of a party whose interests are adverse to the interests of the plan" in a "transaction involving the plan" (§ 1106(b)(2)); or "receive any consideration for [their] own personal account from any party" in connection with a "transaction involving the assets of the plan" (§ 1106(b)(3)).

62.     Just as with 1106(a), transactions prohibited by section 1106(b) are excused only if the fiduciary and other participants to the transaction can show that the plan received adequate consideration for the ESOP shares. 29 U.S.C. § 1108(e)(1).

63.     Section 1106(b) "should be read broadly in light of Congress' concern with the welfare of plan beneficiaries." *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984).

64.    Transfer of ESOP assets to benefit a board member is a fiduciary self-dealing transaction in violation of section 1106(b). *See Montgomery,* 39 F. Supp. 2d at 915, 935 ("The transaction in which [company] redeemed more than 95% of the outstanding shares involved self-dealing" where the "motive behind the transaction was the transfer of ownership to [company president and board member].")

*29 U.S.C. § 1104(a)(1)*

65.    A fiduciary is also liable for failing to act prudently and loyally with respect to any matter involving the fiduciary's duties to the plan. 29 U.S.C. § 1104(a)(1); *see also Brundle,* 919 F.3d at 773 ("[A]n ESOP fiduciary is liable to the plan participants if it breached its fiduciary duties, i.e., failed to act 'solely in the interest of the participants,' with the care, skill, prudence, and diligence used by a 'prudent man acting in a like capacity.'").

66.    An independent trustee is liable if its "decision-making process [is] inadequate." *Id.* at 774. In order to satisfy its duty, a trustee must consider the motivations of the parties and "investigat[e] whether [such motivations] affected the ESOP's legality under ERISA." *Id.* at 778. A trustee must be "critical" of information supplied by company management if management has "financial incentives" in the deal. *Id.* at 775.

67.    If the acquisition of a plan's stock will benefit company insiders, the "corporate insiders with fiduciary duties to the [plan] are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to

insure that they act in the best interests of the plan beneficiaries." *Leigh*, 727 F.2d at 124–26.

68.     ERISA's fiduciary standard also applies to actions that "influenc[e] the outcome of [an independent advisor's] valuations" of company stock. *Perez v. Bruister*, 823 F.3d 250, 259–60 (5th Cir. 2016); *see also Howard v. Shay*, 100 F.3d 1484, 1490 (9th Cir. 1996) ("limiting the information conveyed to the expert" in order to "sway the final valuation that will set the transaction price" was a fiduciary act).

### 29 U.S.C. § 1105(a)

69.     Fiduciaries may also be liable for their actions with respect to other fiduciaries. *See* 29 U.S.C. § 1105(a). Section 1105 requires a fiduciary to attempt to "prevent or remedy the breach" of another fiduciary. *In re Amsted Indus., Inc. Litig.*, 263 F. Supp. 2d 1126, 1130 (N.D. Ill. 2003). Company insider fiduciaries may be liable for "enabling a fiduciary breach by [the ESOP trustee]" by failing to provide true valuation information to the trustee. *See Placht v. Argent Tr. Co.*, 2022 WL 3226809, at *9 (N.D. Ill. Aug. 10, 2022).

### 29 U.S.C. § 1132(a)(3)

70.     Although ERISA sections 1104–1106 do not "explicitly impos[e] a duty upon an 'other person' not to" participate in a fiduciary's violations, the Supreme Court has held that one of ERISA's remedies provisions, section 1132(a)(3), "itself imposes certain duties" upon non-fiduciaries. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245, 248 (2000). This is because section 1132(a) calls for "appropriate equitable relief"—relief that traditionally included "restitution" from

non-fiduciaries who benefited from fiduciary misconduct with "notice of the fiduciary's breach of duty." *Id.* at 250; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011) ("A person who obtains a benefit in breach of a fiduciary duty ... [or] in consequence of another's breach of such a duty, is liable in restitution to the person to whom the duty is owed.").

71.    Courts commonly use the phrase "knowing participation" as shorthand to describe prohibited engagement by a non-fiduciary in an ERISA violation. *See Walsh v. Vinoskey*, 19 F.4th 672, 677–78 (4th Cir. 2021). In the context of a transaction prohibited by section 1106, "to knowingly participate" is to "have knowledge" that the plan's counterparty received consideration "in excess of fair market value." *Id.*; *see also Dolins v. Cont'l Cas. Co.*, 2017 WL 3581143, at *7 (N.D. Ill. Aug. 18, 2017) (allegation that non-fiduciary "had reason to know that the [transaction] would benefit it and, by extension, [a party in interest], to the Plan beneficiaries' detriment" was "plainly enough" to state a knowing participation claim); *Fish v. GreatBanc Tr. Co.*, 109 F. Supp. 3d 1037, 1043 (N.D. Ill. 2015) (participants may seek relief from "a knowing, gratuitous transferee" of an ESOP transaction).

72.    A claim for knowing participation in breach of section 1104 duties may also be made based on a showing that non-fiduciaries had reason to know that the price was unfair to the plan, and thus that the fiduciaries did not engage in a satisfactory review process. *See Placht*, 2022 WL 3226809, at *9 ("The [non-fiduciary defendants] have provided no logical or textual basis for distinguishing a claimed violation of 29 U.S.C. § 1104 from one under 29 U.S.C. § 1106 [for purposes of a

knowing participation claim.]"); *Gamino v. KPC Healthcare Holdings, Inc.*, 2021 WL 5104382, at *6 (C.D. Cal. Nov. 1, 2021) (reasonable to infer that non-fiduciaries, "given their roles and their knowledge of the value of the securities[,] knowingly participated in [fiduciary's] ERISA § 404 breach.").

## CORPORATE GOVERNANCE AND FIDUCIARY DUTIES

73.    As the ESOP's independent trustee, Urbach was obliged to monitor the ESOP's investment. This included taking any action necessary to protect the investment, including investigating corporate misconduct and potential derivative claims. *Donovan v. Bryans*, 566 F. Supp. 1258, 1262 (E.D. Pa. 1983) (citing Restatement (Second) of Trusts § 177 (1959)). ESOP trustees "have a duty to investigate the relevant facts, to explore alternative courses of action and, if in the best interests of the plan participants, to bring suit . . . ." *Harris v. Koenig*, 602 F. Supp. 2d 39, 54 (D.D.C. 2009) (quoting *McMahon v. McDowell*, 794 F.2d 100, 112 (3d Cir. 1986)). This duty is heightened where, as here, "a potential conflict of interest" exists. *Delta Star v. Patton*, 76 F. Supp. 2d 617, 636 (W.D. Pa. 1999).

74.    Del-Air and the Director Defendants had an ongoing duty to monitor Urbach to ensure he was fulfilling his fiduciary duties and to remove him if necessary. 29 C.F.R. § 2509.75-8, FR-17 (a fiduciary who delegates authority retains a fiduciary duty to monitor its delegates and remove them if necessary); *Woods v. Southern Co.*, 396 F. Supp. 2d 1351, 1370-71 (N.D. Ga. 2005); *Blankenship v. Chamberlain*, 695 F. Supp. 2d 966, 976 (E.D. Mo. 2010) (failure to bring a derivative action or remove disloyal corporate officers a breach of fiduciary duty as to the ESOP). As the Eleventh Circuit

23

has recognized, "a fiduciary must always be prepared to reassume a delegated fiduciary duty when it becomes apparent to the fiduciary that the party responsible . . . has breached its obligation." *Willett v. Blue Cross & Blue Shield of Alabama*, 953 F.2d 1335, 1341 (11th Cir. 1992). Thus, in appointing Urbach to serve as the ESOP's independent trustee, Del-Air and the Director Defendants had a duty to monitor Urbach's performance of his fiduciary duties. If reasonable monitoring would have revealed to Del-Air and the Director Defendants that Urbach was failing to fulfill his fiduciary duties, they had a duty to remove Urbach.

75.     This principle applied with even more force when Del-Air and the Director Defendants knew that it was *their* disloyalty and corporate waste that Urbach was failing to monitor and protect against. *Patterson*, 547 F. Supp. 2d at 1243-44 (failure to act on knowledge of director or officers disloyalty is a fiduciary breach).

76.     For example, Del-Air knew that it was using the company's cash to pay off the Dello Russos' low-interest notes at the expense of investing in the company's IT, finance, and business segments. After Bob's death, the Director Defendants likewise knew that the company's new officers were inexperienced, incompetent, and mismanaging the company, further hastening its "death spiral." All the while, they knew Urbach was doing nothing to protect the ESOP's investment. And yet, neither Del-Air nor the Director Defendants ever did anything to inform Urbach of these corporate fiduciary breaches, implore him to rectify them through the judicious use of shareholder agreements, or remove Urbach and hire a trustee who would do so. This was a breach of fiduciary duties. *Canale v. Yegen*, 782 F. Supp. 963, 969 (D.N.J.), *on*

24

*reargument*, 789 F. Supp. 147 (D.N.J. 1992) (where plan fiduciaries know of "fraudulent acts [that] threaten to impair and diminish the value of the plan's investment" and the fiduciary "has a personal interest in the accomplishment of those fraudulent acts" and "fails to protect the plan's assets from loss or dissipation resulting from the fraud" the fiduciary "will be liable, under ERISA, for breach of [its] fiduciary duties"); *Pension & Emp. Stock Ownership Plan Admin. Comm. of Cmty. Bancshares, Inc., o/b/o Cmty. Bancshares, Inc. v. Patterson*, 547 F. Supp. 2d 1230, 1244–45 (N.D. Ala. 2008).

## ESOP GOVERNANCE AND THE ASTARA TRANSACTION

### *Board and Trustee Fiduciary Powers*

77.    Bob led Del-Air's board until to his death in June 2021. After he died, Diane invited his longtime business partner, Barton, to join her on the board.

78.    Barton and Bob partnered on multiple business ventures going back to 2004 or earlier. However, Barton did not own any part of Del-Air until the Astara transaction at issue in this action.

79.    The company's board also included Fortin, Diane's brother-in-law, Brinkley, a banking executive who worked with the Dello Russos over the years, and Hartsgrove, the CEO of a construction company.

80.    The ESOP was governed by written terms called the Plan Document.

81.    Under Sections 2.40 and 14.1 the Plan Document, the company is a named fiduciary of the ESOP responsible for (a) appointing the trustee and monitoring the trustee's performance, (b) communicating a funding policy to the trustee, (c)

providing information to the trustee necessary for the trustee to properly perform his or her duties, and (d) providing a channel for the trustee to communicate directly with participants.

82.    In Section 17.2 of the Plan Document, the company delegated its fiduciary responsibilities to the members of its board. In connection with the recapitalization of Del-Air, the board members performed these duties by continuing to employ Urbach as ESOP trustee, providing him information for his independent review of the transaction, and setting parameters for him to communicate the deal to ESOP participants.

83.    Under Sections 2.28 and 7.5 of the Plan Document, the board may appoint an ESOP Committee empowered to direct the ESOP trustee how to vote shares owned by the ESOP in any matter requiring a shareholder vote. However, for purposes of the Astara transaction, the board exercised the functional powers of the ESOP Committee and recommended that the ESOP trustee vote in favor of the transaction on behalf of the ESOP as the company's sole shareholder.[3]

84.    The ESOP trustee—professional ESOP advisor James Urbach—is a named fiduciary of the ESOP under Section 2.40 of the Plan Document. Section 7.5 provides that the ESOP trustee has discretion to decline to follow any instruction that

---

[3] Based on information available to Plaintiffs at this stage, it is not clear whether an ESOP Committee separate from the company board was active at the time of the Astara transaction. Regardless, it was the board that evaluated the potential deal, approved it, and recommended it to Urbach, not a separate ESOP Committee.

is inconsistent with ERISA. Thus, the trustee is required to independently review any recommended action to determine if it is in the best interest of ESOP participants.

*The Astara Transaction*

85.    The Astara Fund is managed by an affiliated firm, Astara Capital, organized in 2020 to make equity investments in mid-sized companies.

86.    Astara Capital's managing partner previously invested with Bob and Barton in a company Barton founded in 2005 called American Builders Supply. The group exited the American Builders Supply investment in 2017, and Barton joined Astara Capital in 2020. That is, for the entirety of Barton's tenure on Del-Air's board, he was also an investor, advisor, and/or operator for Astara Capital and the Astara Fund.

87.    In addition to investing in the Astara Fund, Barton performed operations duties for Astara Capital, including finding companies for the firm's partners and clients to acquire.

88.    Once seated on the Del-Air board in 2021, Barton played both sides to strike a deal for the Astara Fund to acquire control of Del-Air. Beginning in spring 2022 or earlier, he acted as an agent of both the seller (the ESOP) and the potential buyer (the Astara Fund and its affiliates). After the deal was completed, Barton—speaking on behalf of Astara Capital—told the Orlando Business Journal, "We looked at this deal hard and Del-Air obviously has a great name in town."[4]

---

[4] Steven Ryzewski, New York's Astara Capital acquires Orlando-based Del-Air, ORLANDO BUSINESS JOURNAL, Nov. 4, 2022, *available at*

89.    The Del-Air board did not shop the company in the marketplace and dealt only with Barton and Astara Capital as potential buyers. The Astara Fund and Astara Capital were apprised of all relevant details about the transaction by virtue of Barton's involvement.

90.    After the deal was substantially complete, Barton resigned from Del-Air's board on October 1, 2022. The remaining board members unanimously approved the deal on October 10, 2022, and recommended that Urbach vote the ESOP's shares in favor of the deal in his capacity as ESOP trustee.

91.    Discovery will show that, prior to Barton's resignation, the board alerted Urbach to the proposed deal and provided Urbach information about the company and deal intended for Urbach to perform his duty to independently review the transaction. After the board officially approved and recommended the deal, Urbach decided to vote in favor of the transaction.

92.    The board and Urbach jointly prepared a notice of the deal to ESOP participants and distributed it to them around October 18, 2022. The notice was styled as coming from Urbach, but the board exercised its authority to limit and approve its contents.

---

https://www.bizjournals.com/orlando/news/2022/11/04/del-air-heating-air-conditioning-sold-astara-cap.html. Barton spoke on behalf of Astara Capital in a press release issued by Del-Air concerning the recapitalization. *See* Rob Haines, Del Air Receives Investment from Leading Private Equity Firm, PR NEWSWIRE (Nov. 9, 2022), *available at* https://www.prnewswire.com/news-releases/del-air-receives-investment-from-leading-private-equity-firm-301672587.html (Barton stating that "The Astara team is thrilled to add Del-Air to our portfolio.").

93.    The notice highlighted in bold text that both the board and Urbach had determined that it was in the "best interest" of the ESOP to proceed with the recapitalization. The notice declared that Urbach would vote the ESOP's shares that had not yet been allocated to individual participants in favor of accepting the deal.

94.    The notice superficially invited ESOP participants to advise Urbach how to vote the shares allocated to their accounts—a process required by the Plan Document. However, the notice undermined that invitation by announcing that Urbach was not required to follow participants' instructions if he believed those instructions were contrary to his fiduciary duties. Since Urbach stated in the same notice that he had already concluded the deal was in the best interest of participants, he effectively communicated that he would vote all shares in favor of the deal regardless of the outcome of the poll.

95.    The notice further instructed participants to "rely only on the information contained" in the notice, and that no other information would be given beyond the broad statements in support of the deal contained in the notice. The board and Urbach declined to make company financials or other valuation records available to participants.

96.    Not surprisingly, given the contents and limitations of the notice, most ESOP participants did not respond to the poll. Based on the sum of unallocated shares and shares allocated to participants who did not respond to the poll, Urbach exercised sole shareholder power with respect to around 74% of outstanding shares

(notwithstanding his ultimate discretion, as stated in the notice, with respect all shares regardless of participant instructions).

97.     The ultimate vote was academic given Urbach's prior decision to support the deal and control of at least 74% of outstanding shares. The deal closed on or around October 28, 2022. On behalf of Astara Capital, Barton confirmed the sale to the Orlando Business Journal on November 4, 2022.[5]

98.     The deal involved two parts, each contingent on the other and executed in succession.

99.     First, Del-Air was restructured such that the ESOP owned 100% of the stock of two newly created companies, Del-Air Employee Investor I, Inc. and Del-Air Employee Investor II, Inc. (the "ESOP Entities"), which in turn owned 100% of Del-Air. As part of the restructuring, Del-Air converted from a Florida corporation to Delaware limited liability company. In the end, the ESOP, indirectly through the ESOP Entities, owned 100% of the membership interest of the converted Del-Air.

100.     Second, the ESOP Entities sold their 100% membership interest in the converted Del-Air on a debt-free basis to a newly created holding company called ACP HVAC Holdings LLC, whose membership interest was owned directly or indirectly by the Astara Fund. In exchange, the ESOP Entities received a 24% interest in ACP HVAC Holdings LLC (which, as discussed below, was incorrectly valued in the

---

[5] Steven Ryzewski, New York's Astara Capital acquires Orlando-based Del-Air, ORLANDO BUSINESS JOURNAL, Nov. 4, 2022, *available at*
https://www.bizjournals.com/orlando/news/2022/11/04/del-air-heating-air-conditioning-sold-astara-cap.html.

transaction at around $11.5 million), and the Astara Fund (directly or through ACP HVAC Holdings LLC or another affiliate) paid $35.5 million in cash.

101.    The $35.5 million in cash was paid out in three ways: (a) $23 million to pay off Del-Air and ESOP debts, including $9 million paid to Diane; (b) $5.55 million to pay transaction costs and provide future capital to Del-Air; and (c) $7 million to the ESOP, subject to further limitations and escrow.

102.    The limitations and escrow left only around $4 million available to ESOP participants as consideration for the sale of their shares in the deal. Of this $4 million, $2 million was set aside to pay ongoing distributions to participants who tendered their shares to the company before the deal, plus future ESOP administration expenses. Another $1 million was placed in escrow to cover a potential working capital shortfall and pay possible future claims the Astara Fund may assert against the company.

103.    The 24% stake in ACP HVAC Holdings LLC issued to the ESOP Entities is subject to a limited liability company agreement with the Astara Fund. The limited liability company agreement designates the ESOP Entities' stake to be "Class C" interests ineligible for profits distributions until the Astara Fund and its affiliates recoup their entire investment. The agreement further provides that the Astara Fund or its affiliates may buy out the ESOP Entities' interests at any time.

*Post-Transaction Fiduciary Structure*

104.    Documents available to participants do not provide clear information regarding the post-transaction fiduciary structure of the ESOP. Urbach remains the ESOP trustee. The summary also states that the ESOP Entities are now deemed to be

the ESOP sponsor. The notice does not identify which entity or entities succeeded Del-Air as the ESOP's named fiduciary: the ESOP Entities or Del-Air's direct legal successor, the converted Del-Air controlled by the Astara Fund. No information has been provided regarding the ESOP Entities' board membership or governance of the converted Del-Air.

105.    Based on the information available at this stage, it is reasonable to infer that certain Defendants, or all of them, remain in control of the disposition of the ESOP's remaining interest in Del-Air. Any Defendant or other person who is a member of a body that controls whether the ESOP sells its remaining stake to the Astara Fund, and at what price, is a fiduciary of the post-recapitalization ESOP.

## DEFENDANTS' ACTS AND OMISSIONS THAT WERE DAMAGING TO THE ESOP

*Mismanagement of ESOP During its Operation*

106.    The Astara Fund was not the first outside entity to express interest in acquiring Del-Air, but it is the only entity that had a Del-Air board member giving it special access and control. Prior to the Astara Transaction, between 2019 and 2022, Del-Air received several unsolicited offers for many times more than the Astara Fund paid in 2022. For every offer, neither Del-Air nor Urbach meaningfully pursued the offers, allowing them to die on the vine without explanation.

107.    First, Reliance Comfort Limited Partnership proposed a ██ million deal on December 20, 2019. The only response to the offer was a single meeting set by Reliance, after nearly two months of silence from Del-Air and Urbach following the

submission of Reliance's offer. The next month, Del-Air's president stated that the deal was on hold and the LOI was terminated without explanation.

108. Second, Concentric Equity Partners submitted a Letter of Intent proposing to acquire Del-Air for ██ million on September 24, 2020. This offer was not meaningfully pursued by Del-Air or Urbach without explanation.

109. Third, AEA Investors SBF LP submitted a Letter of Intent proposing to acquire Del-Air for ██ million on March 13, 2021. This offer was also abandoned by Del-Air and Urbach without meaningful explanation.

110. Fourth, the Astara Fund submitted a Letter of Intent proposing to acquire Del-Air for ██ million on August 18, 2021. This time, Urbach and Fortin discussed the offer as soon as it arrived. But weeks later on September 30, Fortin informed Urbach that he had terminated the Astara Fund's Letter of Intent without explanation.

111. Finally, the last Letter of Interest preceding the Astara Transaction was a November 18, 2021 letter from Reliance offering to acquire Del-Air for between ██ ██ million. A couple weeks later, Urbach met with Del-Air management to discuss plans for a solution to Del-Air's "short-term liquidity issues...as we move forward to closing the [Reliance] transaction in March / April." Weeks later the bid appears to have been abandoned without explanation.

112. The Fiduciary Defendants failed to seriously engage with many or all of the Letters of Intent that preceded the Astara Fund's May 20, 2022, letter, even though those offers were vastly better than the one that was ultimately accepted. Between December 2019 and November 2021, Del-Air received *five* offers to purchase the

company at valuations ranging from ███████ to ███████—multiples higher than the valuation at which Urbach would ultimately agree to sell the ESOP's shares. The Fiduciary Defendants did little or nothing in response to most of these offers.

113.   Given the tremendous importance of a potential sale of the company, each offer to buy the company should have been seriously considered by Urbach. Del-Air and then the Director Defendants had a similar duty to investigate those offers, both as corporate fiduciaries and as ERISA fiduciaries tasked with ensuring that Urbach complied with his fiduciary duties. And if each prospective buyer raised persistent concerns about Del-Air's management and operations that were uncovered during diligence, the Board had a legal duty to investigate corporate waste and fraud to protect the ESOP's investment.

*Value of Del-Air Stock at Recapitalization*

114.   Enterprise value is the amount needed to buy a company on a debt-free basis. A common metric for benchmarking the enterprise value of a company is the multiple of revenue method. Companies in the same industry tend to have enterprise values based on similar multiples of revenue. The ESOP historically used this method (among other inputs) to determine Del-Air's enterprise value (and from that, the stock value).

115.   Del-Air was generating at least $140 million in annual revenue at the time of the recapitalization, according to a public acknowledgement by Barton. Based on the average revenue multiple of around 0.5 for heating, ventilation, air conditioning, and refrigeration (HVACR) service companies, Del-Air should have been worth at

least $70 million on an enterprise basis (*i.e.*, including debt).[6] This equals a stock value of at least $47 million at the time of the recapitalization, given $23 million in debt paid through the transaction.

116.    The $47 million estimate is consistent with prior stock valuations performed on behalf of the ESOP. Urbach had previously hired a valuation advisor to conduct a complete analysis of the ESOP's stock value as of year-end 2020. That report, which Urbach approved, valued the ESOP's Del-Air stock at $45.8 million.[7]

117.    Less than two years later, the Director Defendants and Urbach assigned a value of only around $18.5 million to the ESOP's stock in the Astara transaction. The $18.5 million price was a 60% discount compared to the stock's value at year-end 2020, and well below the industry average as a multiple of revenue.

118.    Discovery will show that the true value of the ESOP's stock was consistent with the industry average and prior valuations, and the price paid for the ESOP's stock in the recapitalization should have been between $40 million and $50 million or more. Thus, the ESOP was shortchanged $20 million to $30 million or more in the deal.

---

[6] *See* CAPSTONE PARTNERS, *HVACR Services Sector Update* (Sept. 2022), at 12, *available at* https://www.capstonepartners.com/wp-content/uploads/2022/09/Capstone-Partners-HVACR-Services-MA-Coverage-Report_September-2022-.pdf (hereinafter "2022 HVACR Sector Update"); METRONOME PARTNERS, *HVACR Sector Focus* (2019), at 4, *available at* https://metronomepartners.com/wp-content/uploads/2019/09/HVAC-Q1-Final.pdf (hereinafter "2019 HVACR Sector Focus").
[7] The purchase price between two transactions in 2005 and 2015 was $44.7 million. Between 2005 and 2021, the ESOP received $51.5 million in contributions in order to pay the principal and interest on loans used to acquire the stock.

*Consideration Received by the ESOP*

119.    The consideration received by the ESOP fell short of satisfying even the substantially discounted $18.5 million price for the ESOP's shares—let alone the fair market value of $40 million to $50 million or more.

120.    From the perspective of the Director Defendants and Urbach, the $18.5 million price was satisfied by (a) their valuation of the 24% membership interest in ACP HVAC Holdings LLC issued to the ESOP Entities in the deal and (b) $7 million in cash allocated to the ESOP.

121.    But the Director Defendants and Urbach's valuation of the 24% interest issued to the ESOP Entities was flawed. Assuming their valuation of the enterprise as a whole was correct (which it was not), the ESOP was entitled to an interest in the recapitalized company worth $11.5 million, after taking the $18.5 million stock valuation and subtracting the $7 million in supposed cash consideration received by the ESOP.

122.    To determine the percentage interest in new Del-Air needed to satisfy the ESOP's sale of an $11.5 million stake in old Del-Air, the Director Defendants and Urbach appear to have taken the cash paid by the Astara Fund in the deal ($35.5 million) and divided it by the ratio of the Astara Fund's interest in the recapitalized company to the ESOP Entities' interest in the same,[8] crediting the quotient[9] to the

---

[8] $0.76 \div 0.24 = 3.166$
[9] $\$35,500,000 \div 3.166 = \$11,212.886.92$.

interest sold by the ESOP. Together with the $7 million in cash, this amount equaled the total value assigned to the ESOP's pre-transaction equity of around $18.5 million.

123.    The Director Defendants and Urbach's method of determining the percentage interest owed to the ESOP was unfair because it valued the Astara Fund's *controlling* interest in the recapitalized company the same as the ESOP Entities' *Class C* interest. But the interests were not equal. The value of the ESOP's Class C interest should have been steeply discounted based on (1) the Astara Fund's priority in profits distributions—and the ESOP's corresponding lack of profits distributions—under the limited liability company agreement and (2) the ESOP's lack of control over the company in light of its demotion to minority stakeholder. The ESOP needed to receive better than a 24% Class C stake in recapitalized Del-Air to make up for $11.5 million worth of stock in old Del-Air. Further, the Astara Fund's investment was structured as Preferred Equity, which provided it downside protection by ensuring that any losses would accrue to the ESOP first.

124.    The $7 million in cash credited to the purchase price also was not what it seemed. Nearly $2 million was earmarked to pay ongoing distributions to participants who terminated service with Del-Air prior to the recapitalization and initiated distributions under the terms of the ESOP.[10] Section 11.4(b) of the Plan Document makes the company liable to repurchase shares from terminated

---

[10] The $2 million sum included future ESOP administrative expenses. Given the small amount of ESOP administrative expense typically incurred, it is reasonable to infer that nearly all of the $2 million sum set aside was used to pay pending claims.

participants who request distributions. Thus these pending distribution payments were pre-transaction company debts, not part of the equity value of the shares sold to the Astara Fund in the deal. The amount used to pay pending distributions should not have been credited to the value of the ESOP's shares, meaning that the ESOP was shorted an additional amount beyond the improper discounts applied on the face of the deal.

*The Director Defendants and Urbach's Process*

125.    Discovery will show that the Director Defendants and Urbach's process for determining the price of the ESOP's stock was corrupt and constituted numerous violations of ERISA.

126.    First, Barton was ineligible, as an ESOP fiduciary, to work both sides of the deal. As an Astara Principal, Barton brought particular expertise about Del-Air to the Astara Fund, having partnered with Bob on several business deals prior to the Astara Transaction. Just a month after Bob passed, the Astara Fund began engaging in conversations with Del-Air in August 2021.

127.    Although he resigned from the board 10 days before the final vote in October 2022, his resignation was a contrivance to avoid liability—and it came too late. Before he resigned, Barton negotiated the deal as an agent of both the seller (the ESOP) and the buyer (the Astara Fund and its affiliates) in violation of his duties as an ESOP fiduciary. His selfish interests were on the buyer's side as an investor in and operator for the Astara Fund, and he failed to advocate for a fair deal on behalf of the ESOP.

128.    Indeed, the Astara Fund intentionally negotiated a long exclusivity period with Del-Air, eliciting Del-Air management's commitment as early as May 2022 wherein it developed a value creation plan for months before the close in November 2022. During this time, Barton was on the board of Del-Air and an investor in the Astara Fund. Not coincidentally, 2022 was a period of precipitous decline in Del-Air's value.

129.    Barton had served as both sides of the deal during the formation and submission of the Astara Fund's 2022 offer letter and the negotiations that resulted in worse terms for the ESOP and better terms for the Astara Fund (and thus Barton). Barton was also on the board at the time Reliance made its second offer in November 2021, which failed for unclear reasons, allowing Barton's private equity fund to buy the company at a steep discount.

130.    The Director Defendants and Urbach likewise failed the "good faith" component of the adequate consideration analysis. Before he resigned, Barton served as an agent of both the seller (the ESOP) and the buyer (the Astara Fund and its affiliates) in violation of his duties as an ESOP fiduciary. His selfish interests were on the buyer's side as an investor in and operator for the Astara Fund, and he failed to advocate for a fair deal on behalf of the ESOP. A transaction in which a fiduciary drives down the value owed to the ESOP so as to increase his own profit is not "the product of a determination made by the fiduciary in good faith as defined in proposed § 2510.3–18(b)(3)." *Perez v. Commodity Control Corp.*, 2017 WL 1293619 at *6 (S.D. Fla. Mar. 7, 2017) (citing *Henry*, 445 F.3d at 619).

131.    Second, the deal was calculated to serve Diane's interest in being repaid the $9 million she was owed by the company and the ESOP. Around $5 million of the $9 million constituted notes from the ESOP for shares acquired by the ESOP in 2015. Under the terms negotiated in 2015, the ESOP was entitled to pay the notes over 30 years at the low interest rate of 2.61%. While it was in Diane's interest to be repaid in full in 2022, it was not in the ESOP's interest to accelerate these debts—especially if it was forced to sell the stock at a fire sale price to do so. Within 18 months of bringing Barton onto the board, Diane secured the immediate repayment of her loan, contrary to the ESOP's best interests. The Director Defendants and Urbach failed to consider the ESOP's options objectively and gave favor to the interests of a director, Diane, in breach of their duties as ESOP fiduciaries.

132.    Third, the Director Defendants and Urbach failed to solicit bids from other potential buyers or consider alternatives to the sale of a controlling stake in Del-Air. In the months prior to the recapitalization of Del-Air, mergers and acquisitions in the HVACR services sector experienced a "surge." *See* 2022 HVACR Services Sector Update, at 7. Private equity firms "display[ed] an appetite in the sector due to HVACR service providers' recurring revenue and defensibility." *Id.* This buy-side demand was expected to "attract premium valuations despite rising interest rates." *Id.*

133.    Del-Air had a strong and valuable customer base at the time of the Astara Transaction, and that business underperformance by Del-Air could have been promptly and effectively redressed by an acquiror. Had third-parties other than the Astara Fund been allowed to bid on the shares sold by the ESOP in the Astara

Transaction, there likely may have been bids in excess of the amount paid by the Astara Fund.

134. The Astara Fund noted that Del-Air had been "significantly undermanaged," but better decision making would create opportunity and "dramatically improve profitability" for whoever were to acquire the company. The Astara Fund expected to "recover[] its entire investment in all cases except a liquidation," and "outsized returns." Del-Air was seen by Barton and his Astara Fund as presenting "tremendous potential given its size and scale in the market."

135. Fourth, the valuation process contains indicia of manipulation. During 2022, while Barton was attempting to put together the Astara Transaction, Urbach and his advisor were due to determine the value of the ESOP's stock as of year-end 2021. This annual valuation process was delayed by the board, and the board ultimately replaced the initial set of financial results and assumptions conveyed to Urbach with a new set of financials that weakened Del-Air's 2021 results and future projections. The result was that Urbach issued a valuation report shortly before the Astara Transaction that found a 50% decrease in the value of the ESOP's stock during 2021, and then relied on the same revised financials to support the recapitalization deal.

136. Discovery will show that Barton and the board manipulated the revised financials to obtain a reduced valuation that would support the discounted sale price that they were constructing on a parallel track. Urbach had the requisite knowledge to question these manipulated financials—having assessed and approved a valuation the year before that was more than twice as high—but instead rubber stamped them.

41

137.    Del-Air stock should have been valued at $47 million or more based on the company's annual revenue and the average revenue multiple for HVACR service companies at the time of the Astara Transaction. The Astara Fund's own materials support the notion that annual revenues are an important metric in determining the value of an HVAC company.

138.    At the time of the Astara Transaction, there was a "surge" in M&A activity in the HVACR services sector, with such companies "attract[ing] premium valuations despite rising interest rates." The Astara Fund's analysis confirmed this, noting that "HVAC transaction multiples have increased dramatically over the past 5 years" and "[h]igh transaction multiples result in attractive exit dynamics with numerous private equity-back[ed] strategic acquirors as well as sponsors looking to invest in a new platform." Had the board and Urbach engaged in an independent investigation of the company's value—including soliciting bids from private equity companies—they would have received at least twice as much for Del-Air than the Astara Fund paid. The board and Urbach approved the sale of Del-Air to the Astara Fund "at a significant discount to current M&A multiples." But the attractive market for sellers of an HVACR services company is not mentioned in the valuation report relied upon by the Urbach nor anywhere else in his or the Director Defendants' consideration of the Astara Fund's offer.

139.    Fifth, factors cited by the board and Urbach to justify the deal, and the cut-rate valuation at the center of it, are dubious and self-serving. The board and Urbach cited the COVID-19 pandemic to explain the slashed valuation, but this

42

narrative does not withstand basic scrutiny. The year-end 2020 ESOP valuation—covering the period when pandemic disruptions were most acute—did not find the stock to have decreased in value (instead, the stock increased $4.3 million from year-end 2019). Further, market analysts found that the pandemic *helped* HVACR valuations by increasing demand for indoor air quality solutions. *See* 2022 HVACR Sector Update, at 5.

140.    The board and Urbach also cited supply chain disruptions and rising interest rates. While these short-term challenges were acknowledged by industry analysts at the time, company valuations were not materially affected. *See id.* at 6–7 & 12; 2019 HVACR Sector Focus, at 4. Rather than lend support for the deal, the supposed justifications presented by the board and Urbach underscore their self-serving manipulations and lack of due diligence.

141.    Sixth, the diligence conducted by Urbach in response to the Astara Fund offer that eventually yielded the Astara Transaction was also deficient. In large part, Urbach engaged with the process only in cursory interactions prompted Fortin, who repeatedly urged Urbach to sign off on whatever terms were being offered. Urbach's diligence appears to have consisted of soliciting general input from his valuation advisor and receiving pitches from the Astara Fund. Urbach failed to seriously scrutinize the assumptions underlying the Astara Fund's negotiation positions, or that he took any action to investigate other transaction options.

*Corporate Mismanagement, Disloyalty, and Waste*

142.  Del-Air's value was also burdened by chronic and acute corporate waste, disloyalty, and mismanagement that occurred for years leading up to the Astara Transaction that ultimately yielded a "death spiral." The Fiduciary Defendants had a duty to detect this disloyalty and mismanagement and take corrective action. And as ESOP fiduciaries, Del-Air and the Director Defendants had a duty to report this mismanagement and disloyalty to the Plan. Urbach, as trustee and representative of the owners of 100% of the company's stock, was responsible for monitoring the company's performance pursuant to his fiduciary duty to monitor the investments of the trust, and to take corrective action as necessary to protect and promote the Plan's assets.

143.  To begin with, Del-Air had tremendous inherent value that would have been realized had the company been managed properly. Del-Air was the largest HVAC installer in Central Florida with "deep relationships with builders and a reputation for quality work" that benefited from "weak competition and shortage of supply." After Del-Air's largest competitor exited the market around 2022 "numerous homebuilders desperate [were] for service." As a result, even Del-Air's lagging competitors enjoyed 10–12% EBITDA margins in Florida's thriving housing market.

144.  Further discovery is needed, but the company's problems escalated following the 2015 sale to the ESOP of the Dello Russos' remaining Del-Air shares, giving the ESOP ownership of 100% of the company's shares. This sale was financed by notes to the company from the ESOP, as well as notes to the ESOP from Bob and

Diane themselves. These notes offered very attractive terms to the company, with a

██ interest rate.

145.    Following this sale, the company used the company's profits and free cash flow to repay these low-interest notes. This benefited the Dello Russos, as holders of the notes, but came at the expense of the company, and its investments to maintain and grow the company's operations. Given the low interest rate of these notes, and the need for significant investments in the company's fleet, operations, inventory systems and IT, it was in the company's best interests to make minimum payments on the settlement notes. Yet, on the contrary, the company's cash flow and profits were used mostly to repay the Dello Russo's seller notes.

146.    As a result, the company's operations degraded and left the company flying in the dark. For example, Del-Air had made almost no investment in its "dysfunctional" IT systems, which had no customer portal, no automated lead management, no customer relationship management software, minimal integration of sales and estimating systems, and relied on manual project creation for new construction and replacement sales, and on visual inventory planning. It relied on "an antiquated parts and materials strategy that result[ed] in excess/unnecessary inventory on hand." One of its largest warehouses in Sanford was "a complete mess, creating operational confusion and inefficiencies as well as safety hazards."

147.    The company's accounting and finance departments were likewise "extremely weak, with poor internal controls and accounting practices." Indeed, the books were so poorly maintained that a quality of earnings report could not be

completed in connection with the Astara Transaction. Its financial statements were inaccurate and there were repeated inventory write-offs.

148. Without strategic visibility into the company's leads, operations, and finances, leadership had no discipline, financial targets, or expectations for business segments or employees. They had no "cadence of forecasting by business segment or measurement of progress toward set goals."

149. One example of the consequence of the company's poor management and weak operations was the drastically underperforming though potentially highly profitable Residential Service & Replacement (RSR) and Residential New Construction (RNC) segments. Del-Air was the market leader in these segments in Central Florida, with a strong reputation and highly recognizable brand among consumers in Central Florida. And yet, they were an "under-resourced and drastically underperforming afterthought with tremendous upside" under a "weak management team" that lacked relevant expertise.

150. Post-Covid, during a booming housing market, Del-Air's margins declined in the RSR segment due to inflation. Del-Air failed to raise prices appropriately, which was unsurprising given that its 2022 price increases were based on the average unit invoice for a sample of only ten projects of varying scale and size. Del-Air's pricing had historically been inconsistent and lagged its competitors and post-Covid Del-Air was no different. In 2022 Del-Air finally did raise prices, but it was not enough to offset material inflation. The exit of its largest competitor in Central Florida made it almost certain that Del-Air could have raised prices further. Del-Air's

failure to forecast and set the right pricing was a costly mistake. A $100 increase in each job price would have yielded $1.8 million in gross profit.

151.    At the same time, Del-Air was executing unwise cost-cutting efforts that was causing it to lose job volume, exacerbating its losses caused by inflation. In early 2022, Del-Air laid off 25 service and maintenance technicians. This was badly misguided. Service jobs are a lead generator for replacement jobs and reducing service headcount caused a material decline in job volume.

152.    By August 2022, Del-Air's cash flow problems were reaching a critical point. Its accounts payables and days outstanding were at the highest levels ever, with vendors having to finance the company. Of the ███████████ of accounts payables that were more than 30 days past due, half was critically past due. By 2022 Del-Air was in default of its credit agreement and its line of credit was frozen and it needed a $5 million cash infusion.

153.    During the post-Covid inflationary environment and in the Central Florida market where it lacked any realistic competitor, competent management could have provided Del-Air with an opportunity to alleviate its cash flow problems. The HVAC industry thrived in the post-Covid economy with average EBITDA multiples increasing from 9.8 pre-2018 to 16.1 from 2018–2022. Instead, poor management caused Del-Air's EBITDA to plummet despite the highly favorable circumstances. From 2019 to 2021, Del-Air's EBITDA declined more than ███. In 2021 alone, the value of Del-Air stock plummeted by 30%, from 84 cents to 58 cents. That decline

continued into the months leading to the Astara Transaction in October 2022, where the Astara Fund would pay only ███████ per share.

154.    Rather than intervene to protect the ESOP's investment, the Fiduciary Defendants tolerated or even enabled disloyal and incompetent management by Bob and his successors. After Bob's death, board members Barton and Hartsgrove knew that Del-Air was suffering from a lack of leadership and that its CFO and CEO didn't understand the HVAC business. Hartsgrove reported that Del-Air was "like a 747 without a pilot that's continuing to fly with no one at the controls."

155.    Del-Air's board, particularly Barton and Hartsgrove, had the expertise to diagnose the problems and stop the bleeding. Barton had founded a prominent HVAC company that overlapped substantially with Del-Air in Central Florida. He understood how badly Del-Air's RSR and RNC units were being managed and saw the great potential of Del-Air's strong reputation, brand, and loyal customer base. He had intimate knowledge of the communities, demographics, homebuilders, suppliers, competitors and managerial talent in that industry and region and could have readily identified more effective management. He and Hartsgrove also had the connections needed to help Del-Air broaden its market.

156.    Rather than deploy their expertise and connections to protect the ESOP's investment—as loyal fiduciaries must—they sat idly by as Del-Air's value plummeted so that the Astara Fund could swoop in, buy Del-Air for pennies on the dollar. They then directed their industry expertise to help *the Astara Fund* execute its value creation plan to exploit the "sleeping goldmine" (as the Astara Fund referred to Del-Air) by

increasing prices, gaining new customers, and deepening its market share in underdeveloped markets.

*The Trustee and Board Defendants' Failure to Protect the ESOP*

157. Confronted with mounting evidence that Del-Air was being badly managed and its financial condition was deteriorating precipitously, Urbach failed to monitor the ESOP's investment and to intervene to protect it. Urbach had long known that Bob was prioritizing repayment of the Dello Russo's loan to the ESOP over the company's best interests, which was straining the company's cash flow, and thus causing its operations and business to deteriorate. He also knew that he, the company's officers, and directors were failing to meaningfully pursue sales to other potential buyers. Finally, Urbach knew that Del-Air's management was incompetent, inexperienced, and/or intentionally wasting corporate assets.

158. Had Urbach performed his duties in a prudent and careful manner, exercising the diligence that a similarly situated ESOP trustee would have exercised, Urbach would have detected this wrongdoing. A simple review of the company's consolidated financial statements would have shown the details of the loans to the Dello Russos and their favorable terms. Further review would have also shown the large amount of the company's cash flow being dedicated to pay down the Dello Russos' notes in particular. This alone was enough of a red flag to then investigate whether other capital investments should have been prioritized. But Urbach made no such investigation. Further, even if Urbach remained unaware, the other Fiduciary Defendants each had duties to monitor the performance of Urbach and ensure that he

was performing adequate diligence, as well as a duty to report any wrongdoing that risked impairing the value of the Plan's assets. Their failure to make such reports itself constitutes a breach of fiduciary duties. *See supra* ¶¶ 73–76.

159.    As trustee to the ESOP, Urbach had an obligation to take whatever action was necessary to protect the company and the ESOP's investment. 29 C.F.R. § 2550.404a-1(d)(1) ("The fiduciary duty to manage plan assets that are shares of stock includes the management of shareholder rights appurtenant to those shares"); *see also Johnson v. Couturier*, 2007 WL 3151802, at *5 (E.D. Cal. Oct. 26, 2007) ("fiduciaries of the ESOP . . . had an obligation . . . to exercise the ESOP's rights as a shareholder, [and] remove the existing directors and elect new directors"). As the sole shareholder of Del-Air, Urbach could have unilaterally enacted shareholder agreements, which under Florida law may (a) replace the company's officers, (b) replace the company's directors, (c) broadly dictate matters related to the business and operations of the company, and (d) revoke previously enacted agreements. Fla. Stat. § 607.0732(1)(c), (1)(j), (2)(b); *Blankenship v. Chamberlain*, 695 F. Supp. 2d 966, 976 (E.D. Mo. 2010). *Johnson*, 2007 WL 3151802, at *5. If these actions are ineffective, the trustee is obligated to bring a derivative action to advance the interests of the ESOP. *Id.* Urbach never did any of this and his failure to do so was itself a fiduciary breach. *See* 29 C.F.R. § 2550.404a-1(d)(2) (explaining that the duties of loyalty and prudence apply both "[w]hen deciding *whether* to exercise shareholder rights" and "when exercising such rights"); *Blankenship*, 695 F. Supp. 2d at 976 (defendant was "acting in the capacity of ESOP plan fiduciary when he failed to [exercise the plan's shareholder authority to]

50

remove himself from his management position(s)"); *Johnson*, 2007 WL 3151802, at *5 (fiduciary "had an obligation in administering the ESOP asset, to exercise the ESOP's rights as a shareholder, remove the existing directors and elect new directors" and could be held liable for failing to act upon that obligation).

160.    Del-Air and the Director Defendants could have likewise replaced Del-Air's officers and made the necessary changes to the company's business and operations. At a bare minimum, they, as fiduciaries to the ESOP, had a duty to report to the other Fiduciary Defendants, including Urbach, the impairment to the ESOP's assets that was occurring as a result of the company's disloyal and wasteful decisions and overall management. Their failure to act was a fiduciary breach. *Liss v. Smith*, 991 F. Supp. 278, 303-04 (S.D.N.Y. 1998) ("silence" and "failures to advise the trustees . . . may be viewed as exercising effective control over the Funds" especially when the inaction "redounded to the benefit" of the silent fiduciary).

161.    Instead, neither the Director Defendants nor Urbach considered any option other than tolerating (or worse, hastening) Del-Air's demise so that the Astara Fund could pay off Diane's loan and acquire the Company at a fire-sale price.

162.    Similarly, when confronted with an apparent lengthy record of corporate waste, the Fiduciary Defendants had a fiduciary duty to bring a derivative action (including potentially against the Director Defendants themselves) based on knowledge of acts of corporate mismanagement or self-dealing. *Blankenship*, 695 F. Supp. 2d at 977; *Delta Star, Inc. v. Patton*, 76 F. Supp. 2d 617, 637 (W.D. Pa. 1999);

*Hurtado v. Rainbow Disposal Co.*, 2018 WL 3372752, at *11 (C.D. Cal. July 9, 2018). They made no such attempt.

163.    Urbach likewise had a fiduciary duty to thoroughly investigate the merits of the Astara Transaction. The need was particularly acute given that approving the Astara Transaction terminated the ESOP's right to bring a derivative suit. *Hurtado*, 2018 WL 3372752, at *11. So too were the Director Defendants' fiduciary duties to monitor Urbach in his investigation and review of the Astara Transaction. Again, the Director Defendants knew that Urbach was failing to monitor the Director Defendants' own disloyalty and imprudence in providing Urbach manipulated financial information and yet they never removed Urbach or disclosed their own disloyalty.

*The Future Buyout*

164.    The Director Defendants and Urbach also improperly granted the Astara Fund the right to buy out the ESOP's interest in the recapitalized Del-Air at any time, without seeking additional consideration or protection for the ESOP. Based on the ESOP fiduciaries' performance in connection with the recapitalization, ESOP participants are in jeopardy that their remaining retirement benefit tied to their company will be liquidated at a fraction of its true value. Discovery will show that the procedural safeguards and fiduciary personnel currently in place are insufficient to protect the ESOP from further damages in connection with a future buyout.

## PLAN-WIDE RELIEF

165.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the ESOP pursuant to this statutory provision.

166.    Plaintiffs seek recovery for injuries to the ESOP sustained as a result of prohibited transactions and fiduciary breaches and seek equitable relief on behalf of the ESOP as a whole pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

167.    Plaintiffs are adequate to bring this derivative action on behalf of the ESOP, and their interests are aligned with other participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the ESOP.

## CLASS ACTION ALLEGATIONS

168.    Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

169.    Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the ESOP defined as follows:

> All participants and beneficiaries of the ESOP at the time of the Astara Transaction, excluding any Defendant or employee of Del-Air with fiduciary responsibility on behalf of the ESOP related to the Astara Transaction.

170.   <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had around 1,000 participants.

171.   <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were ESOP participants, and Plaintiffs suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

172.   <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

173.   <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

     a.   Whether the Fiduciary Defendants were fiduciaries with respect to the ESOP and the scope of their fiduciary duties;

     b.   Whether the ESOP's fiduciaries failed to comply with the fiduciary standards of prudence and loyalty;

     c.   Whether the Astara Fund and ACP HVAC Holdings LLC were obligated to provide adequate consideration for the purchase of ESOP assets;

   d.   Whether the Astara Fund and ACP HVAC Holdings LLC provided
        adequate consideration for the purchase of ESOP assets;

   e.   Whether Barton and Diane were parties in interest to the ESOP;

   f.   Whether the transfer and sale of the ESOP's ownership interest in
        Del-Air constituted one or more prohibited transactions;

   g.   Whether Defendants profited from Defendants' violations of
        ERISA;

   h.   The proper form of equitable and injunctive relief; and

   i.   The proper measure of monetary relief.

174.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A)
because prosecuting separate actions against Defendants would create a risk of
inconsistent or varying adjudications with respect to individual Class members that
would establish incompatible standards of conduct for Defendants.

175.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B)
because adjudications with respect to individual Class members, as a practical matter,
would be dispositive of the interests of the other persons not parties to the individual
adjudications or would substantially impair or impede their ability to protect their
interests. Any award of equitable relief by the Court, such as disgorgement of proceeds
of the prohibited transactions and allocation of the proceeds to participants, would be
dispositive of the interests of all participants.

176.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3)
because questions of law and fact common to the Class predominate over any

questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing individual actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single case.

177.    Plaintiffs and their undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

### CAUSES OF ACTION

### Count I
### 29 U.S.C. § 1104(a)(1)
### *Against the Fiduciary Defendants*

178.    The Fiduciary Defendants had an obligation to ensure the ESOP's investment was prudently and loyally managed. With knowledge that the company under Bob's leadership was being disloyally and imprudently managed to benefit the Dello Russos, Del-Air and Urbach had a fiduciary duty to intervene and block the disloyal repayment of the Dello Russo notes, replace the company's directors and/or

officers, bring a derivative suit, or take any other actions necessary to protect the ESOP's investment. They did not.

179.    Del-Air had a parallel duty to monitor Urbach and ensure that Urbach was fulfilling his fiduciary duties of monitoring the ESOP's investment. Knowing that Urbach was not intervening—since Del-Air itself was disloyally putting the interests of the Dello Russos over the company and ESOP—Del-Air's failure to inform Urbach of the actions impairing the value of the ESOP's assets, replace Urbach, or itself intervene on behalf of the ESOP was also a fiduciary breach.

180.    After Bob died, the Director Defendants had a fiduciary duty to monitor Urbach, whose fiduciary duty to monitor the ESOP's investment remains. With full knowledge that the Director Defendants were precipitating and/or ignoring the company's "death spiral" so that the Astara Fund could purchase the company (to Barton's benefit) and pay off Diane's loans (to her benefit), the Director Defendants failed to report on themselves to Urbach. They also failed to replace themselves and the company's officers. These were fiduciary breaches. Urbach also failed to replace the company's Directors and Officers or to bring a derivative suit for disloyalty and corporate waste. By knowingly allowing Urbach to neglect his fiduciary duties to their benefit, the Director Defendants further breached their fiduciary duties.

## Count II
### 29 U.S.C. § 1106(a)
*Against the Director Defendants and Urbach*

181.    The transfer and sale of the ESOP's interest in Del-Air for the benefit of Diane and Barton, parties in interest to the ESOP, constituted one or more prohibited transactions in violation of 29 U.S.C. § 1106(a)(1)(A) & (D).

182.    The Director Defendants caused the prohibited transactions in their capacities as the ESOP fiduciaries responsible for recommending Urbach, as trustee, to transfer the ESOP's shares in the deal. Urbach also caused the prohibited transactions in his capacity as the ESOP fiduciary who ultimately voted for and executed the transfer on behalf of the ESOP.

183.    The circumstances around the transaction show that the consideration provided for the ESOP shares in the recapitalization was inadequate and below-market value.

184.    The Director Defendants and Urbach caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses. Barton and Diane profited from the above-mentioned prohibited transactions and are liable to the ESOP for their profits. They are also liable for appropriate equitable relief to be determined by the Court.

## Count III
### 29 U.S.C. § 1106(b)
*Against the Director Defendants and Urbach*

185.    Barton dealt with ESOP assets for his own benefit in violation of 29 U.S.C. § 1106(b)(1) by negotiating the Astara transaction that benefited him personally

through his interest in the Astara Fund. He also acted on behalf of interests adverse to the ESOP—the Astara Fund and its affiliates—in the process of negotiating the Astara transaction, in violation of 29 U.S.C. § 1106(b)(2). He further violated 29 U.S.C. § 1106(b)(3) by receiving consideration—his indirect interest in ACP HVAC Holdings LLC or incentive compensation tied to the deal—from a parting dealing with the ESOP in connection with a transaction involving assets of the ESOP.

186.   Diane dealt with ESOP assets for her own benefit in violation of 29 U.S.C. § 1106(b)(1) by approving the Astara transaction in order to promptly accelerate and pay ESOP notes and other loans that were not yet due to her. She further violated 29 U.S.C. § 1106(b)(3) by receiving consideration—the accelerated note payments—from a party dealing with the ESOP in connection with a transaction involving assets of the ESOP.

187.   The circumstances around the transaction show that the consideration provided for the ESOP shares in the Astara transaction was inadequate and below-market value.

188.   Fortin, Brinkley, and Urbach knew that Barton and Diane engaged in improper fiduciary self-dealing in violation of 29 U.S.C. § 1106(b). They failed to take appropriate steps, such as soliciting independent acquisition bids or financing proposals, to remedy Barton and Diane's self-dealing. Fortin, Brinkley, and Urbach are therefore jointly liable, pursuant to 29 U.S.C. § 1105(a), with Barton and Diane for their violations of 29 U.S.C. § 1106(b).

189.    Barton and Diane caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses. Barton and Diane also profited from the above-mentioned prohibited transactions and are liable to the ESOP for their profits. Fortin, Brinkley, and Urbach are jointly liable with Barton and Diane. All are also liable for appropriate equitable relief to be determined by the Court.

**Count IV**
**29 U.S.C. § 1104(a)(1)**
*Against the Director Defendants and Urbach*

190.    The Director Defendants and Urbach, as board members and the ESOP trustee, were responsible for obtaining a fair price on behalf of the ESOP in the Astara transaction.

191.    The Director Defendants, as board members, failed to act prudently and solely in the interest of ESOP participants in this process. They created misleading revised financials for Urbach intended to produce an artificially low valuation to support the deal. They declined to allow participants access to the underlying financials and valuation analysis. Barton led negotiations and acted in his own interest, and contrary to the ESOP's interest, by identifying his firm as a potential deal partner for the ESOP and working to construct the deal on terms favorable to himself and his co-investors. Diane acted in her own interest and contrary to the interest of the ESOP by prioritizing the acceleration and payment in full of her notes. All Director Defendants acted imprudently by failing to solicit independent bids despite conflicts of interest on the board in connection with the proposed deal. All Director Defendants

acted imprudently by failing to scrutinize the consideration credited toward the valuation of the ESOP's shares. All Director Defendants acted imprudently by failing to negotiate appropriate consideration or procedural safeguards in the connection with the Astara Fund's right to buy out the ESOP's remaining interest in Del-Air. Diane, Fortin, and Brinkley acted imprudently by ultimately voting to approve the deal on behalf of the ESOP and by recommending Urbach to vote in favor of the deal in his capacity as ESOP trustee.

192.   Urbach, as ESOP trustee, failed to act prudently on behalf of the ESOP. He accepted the board's self-serving revisions to the company's financials without appropriate scrutiny. He voted the ESOP's shares in favor of the deal, and communicated to ESOP participants that he would do so in advance of the participant poll, despite known conflicts of interest on the board and the absence of any independent bidding process.

193.   Urbach failed to monitor the ESOP's investment and to intervene to protect corporate waste. As the sole shareholder, Urbach had the power to unilaterally enter into a shareholder agreement that would have given him shareholder powers pursuant to Fla. Stat. § 607.0732 with respect to officer appointments, director appointments, approval of related-party transactions, and authority to terminate or modify the shareholder agreement. His failure to do so was fiduciary in character.

194.   The Director Defendants had knowledge of their own misconduct and disloyalty as directors of Del-Air that precipitated or tolerated flagrant corporate waste that was causing the ESOP's investment to plummet in value. And yet, as ESOP

fiduciaries with power over director and officer appointments, the Director Defendants failed to act to protect the ESOP.

195.    Had the Director Defendants and Urbach performed their fiduciary duties in the prudent and loyal manner required by ERISA, Plaintiffs and other ESOP participants would have received additional consideration in the Astara transaction, or would have retained all or a larger part of their stake in Del-Air.

196.    The Director Defendants and Urbach caused losses to the ESOP resulting from the above-mentioned fiduciary breaches and are liable to the ESOP for those losses. Barton and Diane also profited from the above-mentioned fiduciary breaches and are liable to the ESOP for their profits. All are also liable for appropriate equitable relief to be determined by the Court.

### Count V
### 29 U.S.C. § 1132(a)(3)
*Against Barton, Diane, and the Astara Fund*

197.    Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations[.]" Such "appropriate equitable relief" includes recovering proceeds of a fiduciary violation from a knowing participant in the violation. *See Harris Trust*, 530 U.S. at 238; *Placht*, 2022 WL 3226809, at *11.

198.    Without regard to their own status as fiduciaries, Barton, Diane, and the Astara Fund had knowledge of the circumstances that rendered the Astara transaction unlawful and knowingly accepted proceeds of those violations. Barton purposefully constructed the deal as a company director to pay less than fair market value to the ESOP in order to enjoy a windfall through his interest in the Astara Fund. The Astara

Fund likewise had knowledge of its windfall through its agent, Barton, and knew that he acted unlawfully as an ESOP fiduciary and party in interest in the connection with the deal. Diane knew that the notes paid to her in full through the deal were not due and that it was not interest of the ESOP to liquidate at a fire sale price in order to accelerate her note payments. Barton, Diane, and the Astara Fund also knew that no fiduciary conducted a competitive bidding process despite conflicts of interest on the board during the construction of the deal, and that the board and Urbach approved the transaction despite this failure. Barton, Diane, and the Astara Fund therefore received proceeds of the recapitalization knowing that those proceeds were fruits of violations of 29 U.S.C. §§ 1106(a), 1106(b), and 1104(a)(1).

199.   The illicit proceeds received by Barton, Diane, are identifiable. The Astara Fund received and holds its proceeds in the form of membership interests in ACP HVAC Holdings LLC. Barton received and holds his proceeds in the form of partnership interests in the Astara Fund, or cash incentive compensation paid in connection with closing. Diane's proceeds constitute cash paid at closing in premature satisfaction of her notes. Such proceeds, and profits derived from such proceeds, may be traced, if necessary, through successive changes in form through the discovery process.

200.   Pursuant to principles of equity, as adopted and applied by federal courts in ERISA cases, Barton, Diane, and the Astara Fund are liable to the ESOP, without regard to their status as fiduciaries or liability under 29 U.S.C. § 1109(a), for undue proceeds of violations of ERISA, and profits thereon.

## **PRAYER FOR RELIEF**

201.    Wherefore, Plaintiffs pray for judgment against Defendants and for the

following relief:

A.    Certify Plaintiffs' authority to seek plan-wide relief on behalf of the ESOP pursuant to 29 U.S.C. § 1132(a)(2);

B.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiffs as class representatives, and certify their counsel as class counsel;

C.    Order Defendants to make good to the ESOP all losses resulting from their violations of ERISA;

D.    Order Barton and Diane to disgorge all profits received through use of the assets of the ESOP;

E.    Impose a constructive trust or equitable lien or surcharge with respect to, and an accounting of, all proceeds of fiduciary breaches and prohibited transactions received by Barton, Diane, or the Astara Fund, and all resulting profits;

F.    Appoint an independent trustee of the ESOP to oversee the allocation of losses, profits, and proceeds recovered on behalf of the ESOP to ESOP participants, consistent with the terms of the ESOP and ERISA;

G.    Approve a fair and equitable plan of allocation of any losses, profits, or proceeds recovered on behalf of the ESOP to ESOP participants;

H.    Remove the Director Defendants and Urbach from any fiduciary positions with respect to the ESOP;

I.    Enjoin the Astara Fund from buying the ESOP's interest in ACP HVAC Holdings LLC;

J.    Order that any future sale of the ESOP's interest in ACP HVAC Holdings LLC be subject to appropriate procedural safeguards;

K.    Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant

to the common fund method;

L.    Award prejudgment and post-judgment interest; and

M.    Award such other and further relief as the Court deems just and
equitable.

Dated: February 14, 2025                **ENGSTROM LEE LLC**

                                        /s/ Jennifer K. Lee
                                        Jennifer K. Lee, MN No. 0399012*
                                        Mark E. Thomson, MN No. 0398260*
                                        Carl F. Engstrom, MN No. 0396298*
                                        323 Washington Ave. N., Suite 200
                                        Minneapolis, MN 55401
                                        Telephone: 612-305-8349
                                        jlee@engstromlee.com
                                        mthomson@engstromlee.com
                                        cengstrom@engstromlee.com

                                        * By Special Admission

                                        **MORGAN & MORGAN, P.A.**
                                        Marc R. Edelman, FL No. 0096342
                                        201 N. Franklin Street, Suite 700
                                        Tampa, FL 33602
                                        Telephone: (813) 223-5505
                                        medelman@forthepeople.com

                                        James J. Henson, FL No. 77476
                                        C. Ryan Morgan, FL No. 0015527
                                        20 N. Orange Avenue, Suite 1600
                                        Orlando, FL 32802
                                        Telephone: (407) 428-6241
                                        jjhenson@forthepeople.com
                                        rmorgan@forthepeople.com

                                        **ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 14th day of February, 2025, the foregoing

was electronically filed using the CM/ECF system, causing a Notice of Electronic

Filing to be transmitted to all counsel of record.

/s/Jennifer K. Lee
Jennifer K. Lee